# UNITED STATES *v.* GAUBERT

No. 89–1793.   Argued November 26, 1990—Decided March 26, 1991

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, BLACKMUN, STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 334.

*Assistant Attorney General Gerson* argued the cause for the United States. With him on the briefs were *Acting Solicitor General Roberts, Deputy Solicitor General Shapiro, Paul J. Larkin, Jr., Anthony J. Steinmeyer,* and *John F. Daly.*

*Abbe David Lowell* argued the cause for respondent. With him on the brief were *Max Hathaway* and *Eugene Gressman.**

JUSTICE WHITE delivered the opinion of the Court.

When the events in this case occurred, the Home Owners' Loan Act of 1933, 12 U. S. C. §§ 1461–1470,[1] provided for the

---

*\*Daniel J. Popeo* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

[1] Subsequent to the events at issue here, and in response to the current crisis in the thrift industry, Congress enacted comprehensive changes to the statutory scheme concerning thrift regulation by means of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub. L. 101–73, 103 Stat. 183. FIRREA abolished the FHLBB and the Federal Savings and Loan Insurance Corporation (FSLIC), two of the agencies at issue here, and repealed the statutory provisions governing

chartering and regulation of federal savings and loan associations (FSLA's). Section 1464(a) authorized the Federal Home Loan Bank Board (FHLBB) "under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation" of FSLA's, and to issue charters, "giving primary consideration to the best practices of thrift institutions in the United States."[2] In this case the FHLBB and the Federal Home Loan Bank--Dallas (FHLB–D)[3] undertook to advise about and oversee certain aspects of the operation of a thrift institution. Their conduct in this respect was challenged by a suit against the United States under the Federal Tort Claims Act, 28 U. S. C. §§ 1346(b), 2671 *et seq.* (FTCA),[4] asserting that the FHLBB and FHLB–D had been negligent in carrying out their supervisory activities. The question before us is whether certain actions taken by the FHLBB and

---

those agencies' conduct. §§ 401, 407, 103 Stat. 354–357, 363. At the same time, it granted to the Federal Deposit Insurance Corporation (FDIC) and the newly established Office of Thrift Supervision discretionary enforcement authority similar to that enjoyed by the former agencies. §§ 201, 301, 103 Stat. 187–188, 277–343.

[2] Section 1464(a) stated in full:

"In order to provide thrift institutions for the deposit or investment of funds and for the extension of credit for homes and other goods and services, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations, or Federal savings banks, and to issue charters therefor, giving primary consideration to the best practices of thrift institutions in the United States. The lending and investment authorities are conferred by this section to provide such institutions the flexibility necessary to maintain their role of providing credit for housing."

[3] FHLB–D was one of the Federal Home Loan Banks (FHLB's) established by the FHLBB pursuant to 12 U. S. C. § 1423. The FHLBB was specifically empowered to authorize the performance by FHLB personnel of "any function" of the FHLBB, except for adjudications and the promulgation of rules and regulations. 12 U. S. C. § 1437(a).

[4] The FTCA, subject to various exceptions, waives sovereign immunity from suits for negligent or wrongful acts of Government employees.

FHLB–D are within the "discretionary function" exception to the liability of the United States under the FTCA. The Court of Appeals for the Fifth Circuit answered this question in the negative. We have the contrary view and reverse.

## I

This FTCA suit arises from the supervision by federal regulators of the activities of Independent American Savings Association (IASA), a Texas-chartered and federally insured savings and loan. Respondent Thomas M. Gaubert was IASA's chairman of the board and largest shareholder. In 1984, officials at the FHLBB sought to have IASA merge with Investex Savings, a failing Texas thrift. Because the FHLBB and FHLB–D were concerned about Gaubert's other financial dealings, they requested that he sign a "neutralization agreement" which effectively removed him from IASA's management. They also asked him to post a $25 million interest in real property as security for his personal guarantee that IASA's net worth would exceed regulatory minimums. Gaubert agreed to both conditions. Federal officials then provided regulatory and financial advice to enable IASA to consummate the merger with Investex. Throughout this period, the regulators instituted no formal action against IASA. Instead, they relied on the likelihood that IASA and Gaubert would follow their suggestions and advice.

In the spring of 1986, the regulators threatened to close IASA unless its management and board of directors were replaced; all of the directors agreed to resign. The new officers and directors, including the chief executive officer who was a former FHLB–D employee, were recommended by FHLB–D. After the new management took over, FHLB–D officials became more involved in IASA's day-to-day business. They recommended the hiring of a certain consultant to advise IASA on operational and financial mat-

ters; they advised IASA concerning whether, when, and how its subsidiaries should be placed into bankruptcy; they mediated salary disputes; they reviewed the draft of a complaint to be used in litigation; they urged IASA to convert from state to federal charter; and they actively intervened when the Texas Savings and Loan Department attempted to install a supervisory agent at IASA. In each instance, FHLB–D's advice was followed.

Although IASA was thought to be financially sound while Gaubert managed the thrift, the new directors soon announced that IASA had a substantial negative net worth. On May 20, 1987, Gaubert filed an administrative tort claim with the FHLBB, FHLB–D, and FSLIC, seeking $75 million in damages for the lost value of his shares and $25 million for the property he had forfeited under his personal guarantee.[5] That same day, the FSLIC assumed the receivership of IASA. After Gaubert's administrative claim was denied six months later, he filed the instant FTCA suit in the United States District Court for the Northern District of Texas. His amended complaint sought $100 million in damages for the alleged negligence of federal officials in selecting the new officers and directors and in participating in the day-to-day management of IASA. The District Court granted the motion to dismiss filed by the United States, finding that all of the challenged actions of the regulators fell within the discretionary function exception to the FTCA, found in 28 U. S. C. § 2680(a).[6] No. CA 3–87–2989–T (Sept. 28, 1988), App. to Pet. for Cert. 21a.

---

[5] Gaubert was required by statute to seek relief from the agencies prior to filing an FTCA suit. See 28 U. S. C. § 2675.

[6] Citing 12 U. S. C. § 1464, the court determined that the FHLBB had broad discretionary authority to regulate the savings and loan industry. Although acknowledging that most of Gaubert's allegations involved the regulators' activity prior to the date of receivership, the court stressed that had the regulators invoked their statutory authority to place IASA in receivership earlier, all of the challenged actions would have fallen within the exception. The court also pointed out that had IASA and Gaubert

The Court of Appeals for the Fifth Circuit affirmed in part and reversed in part. 885 F. 2d 1284 (1989). Relying on this Court's decision in *Indian Towing Co.* v. *United States*, 350 U. S. 61 (1955), the court distinguished between "policy decisions," which fall within the exception, and "operational actions," which do not. 885 F. 2d, at 1287. After claiming further support for this distinction in this Court's decisions in *United States* v. *Varig Airlines*, 467 U. S. 797 (1984), and *Berkovitz* v. *United States*, 486 U. S. 531 (1988), the court explained:

> "The authority of the FHLBB and FHLB-Dallas to take the actions that were taken in this case, although not guided by regulations, is unchallenged. The FHLBB and FHLB-Dallas officials did not have regulations telling them, at every turn, how to accomplish their goals for IASA; this fact, however, does not automatically render their decisions discretionary and immune from FTCA suits. Only policy oriented decisions enjoy such immunity. Thus, the FHLBB and FHLB-Dallas officials were only protected by the discretionary function exception until their actions became operational in nature and thus crossed the line established in *Indian Towing*." 885 F. 2d, at 1289 (citations and footnote omitted).

In the court's view, that line was crossed when the regulators "began to advise IASA management and participate in management decisions." *Id.*, at 1290. Consequently, the

---

failed to cooperate with the regulators, receivership likely would have followed sooner. In the District Court's view, "[t]he fact that [Gaubert] cooperated when he could have refused will not give [him] a cause of action where he otherwise would have none." App. to Pet. for Cert. 24a–25a. Moreover, because the decision to place IASA in receivership involved the exercise of discretion, the decision *not* to do so at an earlier date was necessarily discretionary as well. The court viewed the decision to supervise IASA's activities first by informal means as an extension of the discretionary decision to postpone receivership.

Court of Appeals affirmed the District Court's dismissal of the claims which concerned the merger, neutralization agreement, personal guarantee, and replacement of IASA management, but reversed the dismissal of the claims which concerned the regulators' activities after they assumed a supervisory role in IASA's day-to-day affairs. We granted certiorari, 496 U. S. 935 (1990), and now reverse.

## II

The liability of the United States under the FTCA is subject to the various exceptions contained in § 2680, including the "discretionary function" exception at issue here. That exception provides that the Government is not liable for

> "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U. S. C. § 2680(a).

The exception covers only acts that are discretionary in nature, acts that "involv[e] an element of judgment or choice," *Berkovitz, supra,* at 536; see also *Dalehite* v. *United States,* 346 U. S. 15, 34 (1953); and "it is the nature of the conduct, rather than the status of the actor" that governs whether the exception applies. *Varig Airlines, supra,* at 813. The requirement of judgment or choice is not satisfied if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Berkovitz,* 486 U. S., at 536.

Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary

function exception was designed to shield." *Ibid.* See *Varig Airlines,* 467 U. S., at 813. Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *id.,* at 814, when properly construed, the exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz, supra,* at 537.

Where Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs. In addition, the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected.

Thus, in *Dalehite,* the exception barred recovery for claims arising from a massive fertilizer explosion. The fertilizer had been manufactured, packaged, and prepared for export pursuant to detailed regulations as part of a comprehensive federal program aimed at increasing the food supply in occupied areas after World War II. 346 U. S., at 19–21. Not only was the cabinet-level decision to institute the fertilizer program discretionary, but so were the decisions concerning the specific requirements for manufacturing the fertilizer. *Id.,* at 37–38. Nearly 30 years later, in *Varig Airlines,* the Federal Aviation Administration's actions in formulating and implementing a "spot-check" plan for airplane inspection were protected by the discretionary function exception because of the agency's authority to establish safety standards for airplanes. 467 U. S., at 815. Actions taken in furtherance of the program were likewise protected, even if those particular actions were negligent. *Id.,* at 820. Most recently, in *Berkovitz,* we examined a comprehensive regula-

tory scheme governing the licensing of laboratories to produce polio vaccine and the release to the public of particular drugs. 486 U. S., at 533. We found that some of the claims fell outside the exception, because the agency employees had failed to follow the specific directions contained in the applicable regulations, *i. e.*, in those instances, there was no room for choice or judgment. *Id.*, at 542–543. We then remanded the case for an analysis of the remaining claims in light of the applicable regulations. *Id.*, at 544.

Under the applicable precedents, therefore, if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation. See *Dalehite, supra*, at 36. If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

Not all agencies issue comprehensive regulations, however. Some establish policy on a case-by-case basis, whether through adjudicatory proceedings or through administration of agency programs. Others promulgate regulations on some topics, but not on others. In addition, an agency may rely on internal guidelines rather than on published regulations. In any event, it will most often be true that the general aims and policies of the controlling statute will be evident from its text.

When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding

that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.[7]

## III

In light of our cases and their interpretation of § 2680(a), it is clear that the Court of Appeals erred in holding that the exception does not reach decisions made at the operational or management level of the bank involved in this case. A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policy-making or planning functions. Day-to-day management of banking affairs, like the management of other businesses, regularly requires judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines, supra,* at 813.

In *Varig Airlines,* the Federal Aviation Administration had devised a system of "spot-checking" airplanes. We held that not only was this act discretionary but so too were the acts of agency employees in executing the program since they had a range of discretion to exercise in deciding how to carry out the spot-check activity. 467 U. S., at 820. Likewise in

---

[7] There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Berkovitz*, although holding that some acts on the operational level were not discretionary and therefore were without the exception, we recognized that other acts, if held to be discretionary on remand, would be protected. 486 U. S., at 545.

The Court's first use of the term "operational" in connection with the discretionary function exception occurred in *Dalehite*, where the Court noted that "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the practicability of the Government's fertilizer program." 346 U. S., at 42. Gaubert relies upon this statement as support for his argument that the Court of Appeals applied the appropriate analysis to the allegations of the amended complaint, but the distinction in *Dalehite* was merely description of the level at which the challenged conduct occurred. There was no suggestion that decisions made at an operational level could not also be based on policy.

Neither is the decision below supported by *Indian Towing*. There the Coast Guard had negligently failed to maintain a lighthouse by allowing the light to go out. The United States was held liable, not because the negligence occurred at the operational level but because making sure the light was operational "did not involve any permissible exercise of policy judgment." *Berkovitz*, 486 U. S., at 538, n. 3. Indeed, the Government did not even claim the benefit of the exception but unsuccessfully urged that maintaining the light was a governmental function for which it could not be liable. The Court of Appeals misinterpreted *Berkovitz*'s reference to *Indian Towing* as perpetuating a nonexistent dichotomy between discretionary functions and operational activities. 885 F. 2d, at 1289. Consequently, once the court determined that some of the actions challenged by Gaubert occurred at an operational level, it concluded, incorrectly, that those actions must necessarily have been outside the scope of the discretionary function exception.

## IV

We now inquire whether the Court of Appeals was correct in holding that some of the acts alleged in Gaubert's amended complaint were not discretionary acts within the meaning of § 2680(a). The decision we review was entered on a motion to dismiss. We therefore "accept all of the factual allegations in [Gaubert's] complaint as true" and ask whether the allegations state a claim sufficient to survive a motion to dismiss. *Berkovitz, supra*, at 540.

The Court of Appeals dismissed several of the allegations in the amended complaint on the ground that the challenged activities fell within the discretionary function exception. These allegations concerned "the decision to merge IASA with Investex and seek a neutralization agreement from Gaubert," as well as "the decision to replace the IASA Board of Directors with FHLBB approved persons, and the actions taken to effectuate that decision." 885 F. 2d, at 1290. Gaubert has not challenged this aspect of the court's ruling. Consequently, we review only those allegations in the amended complaint which the Court of Appeals viewed as surviving the Government's motion to dismiss.

These claims asserted that the regulators had achieved "a constant federal presence" at IASA. App. 14, ¶ 33. In describing this presence, the amended complaint alleged that the regulators "consult[ed] as to day-to-day affairs and operations of IASA," *id.*, at 14, ¶ 33a; "participated in management decisions" at IASA board meetings, *id.*, at 14, ¶ 33b; "became involved in giving advice, making recommendations, urging, or directing action or procedures at IASA," *id.*, at 14, ¶ 33c; and "advised their hand-picked directors and officers on a variety of subjects," *id.*, at 14, ¶ 34. Specifically, the complaint enumerated seven instances or kinds of objectionable official involvement. First, the regulators "arranged for the hiring for IASA of . . . consultants on operational and financial matters and asset management." *Id.*, at 14, ¶ 34a. Sec-

ond, the officials "urged or directed that IASA convert from a state-chartered savings and loan to a federally-chartered savings and loan in part so that it could become the exclusive government entity with power to control IASA." *Id.*, at 14, ¶34b. Third, the regulators "gave advice and made recommendations concerning whether, when, and how to place IASA subsidiaries into bankruptcy." *Id.*, at 15, ¶34c. Fourth, the officials "mediated salary disputes between IASA and its senior officers." *Id.*, at 15, ¶34d. Fifth, the regulators "reviewed a draft complaint in litigation" that IASA's board contemplated filing and were "so actively involved in giving advice, making recommendations, and directing matters related to IASA's litigation policy that they were able successfully to stall the Board of Directors' ultimate decision to file the complaint until the Bank Board *in Washington* had reviewed, advised on, and commented on the draft." *Id.*, at 15, ¶34e (emphasis in original). Sixth, the regulators "actively intervened with the Texas Savings and Loan Department (IASA's principal regulator) when the State attempted to install a supervisory agent at IASA." *Id.*, at 15, ¶34f. Finally, the FHLB–D president wrote the IASA board of directors "affirming that his agency had placed that Board of Directors into office, and describing their mutual goal to protect the FSLIC insurance fund." *Id.*, at 15–16, ¶34g. According to Gaubert, the losses he suffered were caused by the regulators' "assumption of the duty to participate in, and to make, the day-to-day decisions at IASA and [the] negligent discharge of that assumed duty." *Id.*, at 17, ¶39. Moreover, he alleged that "[t]he involvement of the FHLB–Dallas in the affairs of IASA went beyond its normal regulatory activity, and the agency actually substituted its decisions for those of the directors and officers of the association." *Id.*, at 19, ¶55.

We first inquire whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations. *Berkovitz, supra,* at 536.

Although the FHLBB, which oversaw the other agencies at issue, had promulgated extensive regulations which were then in effect, see 12 CFR §§ 500–591 (1986), neither party has identified formal regulations governing the conduct in question. As already noted, 12 U. S. C. § 1464(a) authorizes the FHLBB to examine and regulate FSLA's, "giving primary consideration to the best practices of thrift institutions in the United States." Both the District Court and the Court of Appeals recognized that the agencies possessed broad statutory authority to supervise financial institutions.[8] The relevant statutory provisions were not mandatory, but left to the judgment of the agency the decision of when to institute proceedings against a financial institution and which mechanism to use. For example, the FSLIC had authority to terminate an institution's insured status, issue cease-and-desist orders, and suspend or remove an institution's officers, if "in the opinion of the Corporation" such action was warranted because the institution or its officers were engaging in an "unsafe or unsound practice" in connection with the business of the institution. 12 U. S. C. §§ 1730(b)(1), (e)(1), (g)(1). The FHLBB had parallel authority to issue cease-and-desist orders and suspend or remove an institution's officers. §§ 1464(d)(2)(A), (d)(4)(a). Although the statute enumerated specific grounds warranting an appointment by the FHLBB of a conservator or receiver, the determination of whether any of these grounds existed depended upon "the opinion of the Board." § 1464(d)(6)(A). The agencies here were not bound to act in a particular way; the exercise of their authority involved a great "element of judgment or choice." *Berkovitz, supra,* at 536.

We are unconvinced by Gaubert's assertion that because the agencies did not institute formal proceedings against IASA, they had no discretion to take informal actions as they

[8] As explained above, the agencies at issue here have since been abolished, although they have been replaced by agencies possessing similar discretionary authority. See n. 1, *supra.*

did. Although the statutes provided only for formal proceedings, there is nothing in the language or structure of the statutes that prevented the regulators from invoking less formal means of supervision of financial institutions. Not only was there no statutory or regulatory mandate which compelled the regulators to act in a particular way, but there was no prohibition against the use of supervisory mechanisms not specifically set forth in statute or regulation.

This is the view of the FHLBB; for in a resolution passed in 1982, the FHLBB adopted "a formal statement of policy regarding the Bank Board's use of supervisory actions," which provided in part:

> "In carrying out its supervisory responsibilities with respect to thrift institutions insured by the Federal Savings and Loan Insurance Corporation ('FSLIC'), . . . it is the policy of the Federal Home Loan Bank Board that violations of law or regulation, and unsafe or unsound practices will not be tolerated and will result in the initiation of strong supervisory and/or enforcement action by the Board. It is the Bank Board's goal to minimize, and where possible, to prevent losses occasioned by violations or unsafe and unsound practices by taking prompt and effective supervisory action. . . .

> "The Board recognizes that supervisory actions must be tailored to each case, and that such actions will vary according to the severity of the violation of law or regulation or the unsafe or unsound practice, as well as to the responsiveness and willingness of the association to take corrective action. The following guidance should be considered for all supervisory actions.

> "In each case, based upon an assessment of management's willingness to take appropriate corrective action and the potential harm to the institution if corrective action is not effected, the staff must weigh the appropriateness of available supervisory actions. If the potential harm is slight and there is a substantial prob-

ability that management will correct the situation, informal supervisory guidance and oversight is appropriate. If some potential harm to the institution or its customers is likely, a supervisory agreement should be promptly negotiated and implemented. If substantial financial harm may occur to the institution, its customers, or the FSLIC and there is substantial doubt that corrections will be made promptly, a cease-and-desist order should be sought immediately through the Office of General Counsel." FHLBB Resolution No. 82–381 (May 26, 1982), reprinted in Brief for Respondent 4a–6a.

From this statement it is clear that the regulators had the discretion to supervise IASA through informal means, rather than invoke statutory sanctions.[9]

Gaubert also argues that the challenged actions fall outside the discretionary function exception because they involved the mere application of technical skills and business expertise. Brief for Respondent 33. But this is just another way of saying that the considerations involving the day-to-day management of a business concern such as IASA are so precisely formulated that decisions at the operational level never involve the exercise of discretion within the meaning of § 2680(a), a notion that we have already rejected in disapproving the rationale of the Court of Appeals' decision. It may be that certain decisions resting on mathematical calculations, for example, involve no choice or judgment in carrying out the calculations, but the regulatory acts alleged here are not of that genre. Rather, it is plain to us that each of the challenged actions involved the exercise of choice and judgment.

---

[9] We note that in a recent opinion by Judge Garza, who also wrote the opinion at issue here, the Court of Appeals for the Fifth Circuit refused to extend its decision in *Gaubert* to impose liability on the FDIC for failure to institute statutory receivership proceedings against a thrift. See *Federal Deposit Insurance Corp.* v. *Mmahat*, 907 F. 2d 546, 552 (1990).

We are also convinced that each of the regulatory actions in question involved the kind of policy judgment that the discretionary function exception was designed to shield. The FHLBB Resolution quoted above, coupled with the relevant statutory provisions, established governmental policy which is presumed to have been furthered when the regulators exercised their discretion to choose from various courses of action in supervising IASA. Although Gaubert contends that day-to-day decisions concerning IASA's affairs did not implicate social, economic, or political policies, even the Court of Appeals recognized that these day-to-day "operational" decisions were undertaken for policy reasons of primary concern to the regulatory agencies:

> "[T]he federal regulators here had two discrete purposes in mind as they commenced day-to-day operations at IASA. First, they sought to protect the solvency of the savings and loan industry at large, and maintain the public's confidence in that industry. Second, they sought to preserve the assets of IASA for the benefit of depositors and shareholders, of which Gaubert was one." 885 F. 2d, at 1290.

Consequently, Gaubert's assertion that the day-to-day involvement of the regulators with IASA is actionable because it went beyond "normal regulatory activity" is insupportable.

We find nothing in Gaubert's amended complaint effectively alleging that the discretionary acts performed by the regulators were not entitled to the exemption. By Gaubert's own admission, the regulators replaced IASA's management in order to protect the FSLIC's insurance fund; thus it cannot be disputed that this action was based on public policy considerations. The regulators' actions in urging IASA to convert to federal charter and in intervening with the state agency were directly related to public policy considerations regarding federal oversight of the thrift industry. So were advising the hiring of a financial consultant, advising when to place IASA subsidiaries into bankruptcy, intervening on IASA's

behalf with Texas officials, advising on litigation policy, and mediating salary disputes. There are no allegations that the regulators gave anything other than the kind of advice that was within the purview of the policies behind the statutes.

There is no doubt that in advising IASA the regulators used the power of persuasion to accomplish their goals. Nevertheless, we long ago recognized that regulators have the authority to use such tactics in supervising financial institutions. In *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321 (1963), the Court considered the wide array of supervisory tools available to the Federal Deposit Insurance Corporation and the Federal Reserve System in overseeing banks. Noting the "frequent and intensive" nature of bank examinations and the "detailed periodic reports" banks were required to submit, the Court found that "the agencies maintain virtually a day-to-day surveillance of the American banking system." *Id.*, at 329. Moreover, the agencies' ability to terminate a bank's insured status and invoke other less drastic sanctions meant that "recommendations by the agencies concerning banking practices tend to be followed by bankers without the necessity of formal compliance proceedings." *Id.*, at 330. These statements apply with equal force to supervision by federal agencies of the savings and loan industry. More than 30 years ago, the Court of Appeals for the Fifth Circuit made similar observations in a case involving allegations that the FHLBB had improperly pressured a savings and loan's directors to resign. See *Miami Beach Federal Savings & Loan Association* v. *Callander*, 256 F. 2d 410 (1958). The court noted that "[w]hen a governmental agency holds such great powers over its offspring, even to the point of appointing a conservator or receiver to replace the management . . . , it is difficult to hold that an informal request, even demand, to clean house would amount to an abuse of the statutory powers and discretion of the agency." *Id.*, at 414–415. Consequently, neither the pervasiveness of the regulators' presence at IASA nor the forcefulness of their

recommendations is sufficient to alter the supervisory nature of the regulators' actions.

In the end, Gaubert's amended complaint alleges nothing more than negligence on the part of the regulators. Indeed, the two substantive counts seek relief for "negligent selection of directors and officers" and "negligent involvement in day-to-day operations." App. 17, 18. Gaubert asserts that the discretionary function exception protects only those acts of negligence which occur in the course of establishing broad policies, rather than individual acts of negligence which occur in the course of day-to-day activities. Brief for Respondent 39. But we have already disposed of that submission. See *supra*, at 325. If the routine or frequent nature of a decision were sufficient to remove an otherwise discretionary act from the scope of the exception, then countless policy-based decisions by regulators exercising day-to-day supervisory authority would be actionable. This is not the rule of our cases.

V

Because from the face of the amended complaint, it is apparent that all of the challenged actions of the federal regulators involved the exercise of discretion in furtherance of public policy goals, the Court of Appeals erred in failing to find the claims barred by the discretionary function exception of the FTCA. We therefore reverse the decision of the Court of Appeals for the Fifth Circuit and remand for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I concur in the judgment and in much of the opinion of the Court. I write separately because I do not think it necessary to analyze individually each of the particular actions challenged by Gaubert, nor do I think an individualized analysis necessarily leads to the results the Court obtains.

## I

The so-called discretionary function exception to the Federal Tort Claims Act (FTCA) does not protect all governmental activities involving an element of choice. *Berkovitz* v. *United States*, 486 U. S. 531, 536–537 (1988). The choice must be "grounded in social, economic, [or] political policy," *United States* v. *Varig Airlines*, 467 U. S. 797, 814 (1984), or, more briefly, must represent a "policy judgment," *Berkovitz*, *supra*, at 537. Unfortunately, lower courts have had difficulty in applying this test.

The Court of Appeals in this case concluded that a choice involves policy judgment (in the relevant sense) if it is made at a planning rather than an operational level within the agency. 885 F. 2d 1284, 1287 (CA5 1989). I agree with the Court that this is wrong. I think, however, that the level at which the decision is made is often *relevant* to the discretionary function inquiry, since the answer to that inquiry turns on *both* the subject matter *and* the office of the decisionmaker. In my view a choice is shielded from liability by the discretionary function exception if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations.

This test, by looking not only to the decision but also to the officer who made it, recognizes that there is something to the planning vs. operational dichotomy—though the "something" is not precisely what the Court of Appeals believed. Ordinarily, an employee working at the operational level is not responsible for policy decisions, even though policy considerations may be highly relevant to his actions. The dock foreman's decision to store bags of fertilizer in a highly compact fashion is not protected by this exception because, even if he carefully calculated considerations of cost to the Government vs. safety, it was not his responsibility to ponder such things; the Secretary of Agriculture's decision to the same

effect *is* protected, because weighing those considerations is his task. Cf. *Dalehite* v. *United States*, 346 U. S. 15 (1953). In *Indian Towing Co.* v. *United States*, 350 U. S. 61 (1955), the United States was held liable for, among other things, the failure of Coast Guard maintenance personnel adequately to inspect electrical equipment in a lighthouse; though there could conceivably be policy reasons for conducting only superficial inspections, the decisions had been made by the maintenance personnel, and it was assuredly not their responsibility to ponder such things. This same factor explains why it is universally acknowledged that the discretionary function exception never protects against liability for the negligence of a vehicle driver. See *ante*, at 325, n. 7. The need for expedition vs. the need for safety may well represent a policy choice, cf. *Dalehite, supra*, but the Government does not expect its drivers to make that choice on a case-by-case basis.

Moreover, not only is it necessary for application of the discretionary function exception that the decisionmaker be an official who possesses the relevant policy responsibility, but also the decisionmaker's close identification with policymaking can be strong evidence that the other half of the test is met —*i. e.*, that the subject matter of the decision is one that ought to be informed by policy considerations. I am much more inclined to believe, for example, that the manner of storing fertilizer raises economic policy concerns if the decision on that subject has been reserved to the Secretary of Agriculture himself. That it is proper to take the level of the decisionmaker *into* account is supported by the phrase of the FTCA immediately preceding the discretionary function exception, which excludes governmental liability for acts taken, "'exercising due care, in the execution of a . . . regulation, whether or not such . . . regulation be valid.'" *Dalehite*, 346 U. S., at 18. We have taken this to mean that regulations "[can]not be attacked by claimants under the Act." *Id.*, at 42. This immunity represents an absolute statutory pre-

sumption, so to speak, that all regulations involve policy judgments that must not be interfered with. I think there is a similar presumption, though not an absolute one, that decisions reserved to policymaking levels involve such judgments—and the higher the policymaking level, the stronger the presumption.

## II

Turning to the facts of the present case, I find it difficult to say that the particular activities of which Gaubert complains are necessarily discretionary functions, so that a motion to dismiss could properly be granted on that ground. To take but one example, Gaubert alleges that the regulators acted negligently in selecting consultants to advise the bank. The Court argues that such a decision, even though taken in the course of "day-to-day" management, surely involves an element of choice. But that answers only the first half of the *Berkovitz* inquiry. It remains to be determined whether the choice is of a policymaking nature. Perhaps one can imagine a relatively high-level Government official, authorized generally to manage the bank in such fashion as to further applicable Government policies, who hires consultants and other employees with those policy objectives in mind. The discretionary function exception arguably *would* protect such a hiring choice. But one may also imagine a federal officer of relatively low level, authorized to hire a bank consultant by applying ordinary standards of business judgment, and not authorized to consider matters of Government policy in the process. That hiring decision would not be protected by the discretionary function exception, even though some element of choice is involved.

I do not think it advances the argument to observe, *ante*, at 333, that "[t]here are no allegations that the regulators gave anything other than the kind of advice that was within the purview of the policies behind the statutes." An official may act "within the purview" of the relevant policy without himself making policy decisions—in which case, if the action is

negligent (and was not specifically mandated by the relevant policy, see *Dalehite, supra,* at 36), the discretionary function exception does not bar United States liability. Contrariwise, action "outside the purview" of the relevant policy does not necessarily fail to qualify for the discretionary function defense. If the action involves policy discretion, and the officer is authorized to exercise that discretion, the defense applies even if the discretion has been exercised erroneously, so as to frustrate the relevant policy. See 28 U. S. C. § 2680(a) (discretionary function exception applies "whether or not the discretion involved be abused"). In other words, action "within the purview" of the relevant policy is neither a necessary nor a sufficient condition for invoking the discretionary function exception.

The present case comes to us on a motion to dismiss. Lacking any sort of factual record, we can do little more than speculate as to whether the officers here exercised policymaking responsibility with respect to the individual acts in question. Without more, the motion would have to be denied. I think, however, that the Court's conclusion to the contrary is properly reached under a slightly different approach. The alleged misdeeds complained of here were not actually committed by federal officers. Rather, federal officers "recommended" that such actions be taken, making it clear that if the recommendations were not followed the bank would be seized and operated directly by the regulators. In effect, the Federal Home Loan Bank Board (FHLBB) imposed the advice which Gaubert challenges as a condition of allowing the bank to remain independent. But surely the decision whether or not to take over a bank is a policy-based decision to which liability may not attach—a decision that ought to be influenced by considerations of "social, economic, [or] political policy," *Varig Airlines,* 467 U. S., at 814, and that in the nature of things can only be made by FHLBB officers responsible for weighing such considerations. I think a corollary is that setting the *conditions* under which the

FHLBB will or will not take over a bank is an exercise of policymaking discretion. By establishing such a list of conditions, as was done here, the Board in effect announces guidelines pursuant to which it will exercise its discretionary function of taking over the bank. Establishing guidelines for the exercise of a discretionary function is unquestionably a discretionary function. Thus, without resort to item-by-item analysis, I would find each of Gaubert's challenges barred by the discretionary function exception.