2006 VT 37

**Bridget M. JOHNSON v. AGENCY OF TRANSPORTATION**

[904 A.2d 1060]

No. 05-090

¶ 1. May 8, 2006. Plaintiff Bridget M. Johnson appeals from an order granting summary judgment in favor of defendant Agency of Transportation (AOT). Plaintiff had sued AOT for damages for injuries she sustained in an automobile accident, arguing that AOT was negligent in failing to provide adequate temporary traffic control during routine traffic signal maintenance. The trial court held that the lawsuit was barred by the discretionary function exception to the Vermont Tort Claims Act, 12 V.S.A. § 5601(e)(1). We affirm.

¶ 2. The following facts are undisputed. At approximately noon on September 10, 2002, AOT traffic signal technician Russell Velander performed routine maintenance work on a master traffic signal controller at the intersection of U.S. Route 7 and Mountain View Drive in Colchester, Vermont. The maintenance was intended to coordinate a series of traffic signals along Route 7. During the maintenance, Velander put the traffic signal at that intersection on manual flash mode. Once turned to manual flash, the traffic signal flashed yellow for motorists traveling on Route 7 and flashed red for motorists traveling on Mountain View Drive. No other traffic control was used during this seventeen-minute interval.

¶ 3. Shortly after Velander set the signal to flashing mode, plaintiff approached the intersection in the south-bound, right-hand lane of Route 7. At the same time, Marguerite Majarian attempted to turn left from Mountain View Drive into a north-bound lane of Route 7. Majarian struck the passenger side of plaintiff's vehicle, causing serious injury to plaintiff.

¶ 4. Plaintiff brought a negligence suit against AOT, alleging that the accident was caused by Velander's negligence in: (1) "putting the traffic control signal on flashing red and yellow at this time of day," i.e., a time of heavy traffic volume; and (2) "failing to provide adequate traffic control during this period of routine maintenance." The trial court granted AOT's motion for summary judgment, holding that "a state employee's decisions as to the time and manner of traffic signal maintenance fall[] within the discretionary function exception to the Vermont Tort Claims Act." Plaintiff concedes on appeal that the timing of traffic signal maintenance is a discretionary function within the meaning of 12 V.S.A. § 5601(e)(1) but appeals the trial court's conclusions as to the manner of the maintenance. We review the grant of summary judgment under the same standard as the trial court: we will not affirm unless there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Lane v. State*, 174 Vt. 219, 222, 811 A.2d 190, 193 (2002).

¶ 5. The Vermont Tort Claims Act is a limited waiver of the State's sovereign immunity from suit. 12 V.S.A. § 5601. Pursuant to the Act, the State retains immunity from:

> [a]ny claim based upon an act
> or omission of an employee of

the state exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation is valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused.

*Id.* § 5601(e)(1). The discretionary function exception is designed to ensure that courts do not second-guess legislative or administrative policy judgments through tort law. *Estate of Gage v. State*, 2005 VT 78, ¶ 4, 178 Vt. 212, 882 A.2d 1157.

¶ 6. In *Searles v. Agency of Transportation,* 171 Vt. 562, 563, 762 A.2d 812, 813-14 (2000) (mem.), we adopted the two-part test articulated by *United States v. Gaubert,* 499 U.S. 315 (1991), for determining whether a claim for damages against the State is barred by the discretionary function exception. The first question is whether the challenged act involves "'an element of judgment or choice,'" or whether a "'statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Gaubert,* 499 U.S. at 322 (quoting *Berkovitz v. United States,* 486 U.S. 531, 536 (1988)). If the actor is simply following a specified course of action, there is no exercise of discretion. If, however, the court concludes that the act involves judgment or choice, it proceeds to the second question, which asks whether the judgment "'is of the kind that the discretionary function exception was designed to shield.'" *Id.* at 322-23 (quoting *Berkovitz,* 486 U.S. at 536). And, when a statute, regulation, or policy vests discretion in the employee, it is presumed that the employee's acts are grounded in policy when exercising that discretion. *Id.* at 324; *Searles,* 171 Vt. at 563, 762 A.2d at 814. Thus, for purposes of analyzing the

second question, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert,* 499 U.S. at 324. Therefore, plaintiff's role in a motion for summary judgment is to allege facts sufficient to support a finding that the challenged act is not the *type of act* protected by the exception. *Id.* at 324-25. The focus of this analysis is on whether the actions taken are "susceptible to policy analysis," and not on the employee's "subjective intent in exercising the discretion conferred by . . . regulation." *Id.* at 325.

¶ 7. The Manual on Uniform Traffic Control Devices has been adopted by the State of Vermont as the standard for all traffic control signals within the state. 23 V.S.A. § 1025(a); Fed. Highway Admin., U.S. Dep't of Transp., Manual on Uniform Traffic Control Devices for Streets and Highways (Millenium ed. 2000) [hereinafter MUTCD]. The MUTCD is divided into "Standard[s]," "Guidance," "Option[s]," and "Support." *Id.* at I-3 to I-4. Only the standards are binding on AOT. See *id.* at I-3 (defining a "Standard" as "a statement of required, mandatory, or specifically prohibitive practice regarding a traffic control device"). The material in the other three categories is offered for AOT's consideration, to be used or not at the agency's discretion. See *id.* at I-3 to I-4 (defining "Guidance" as "a statement of recommended, but not mandatory, practice"; an "Option" as "a statement of practice that is a permissive condition and carries no requirement or recommendation"; and "Support" as "an informational statement that does not convey any degree of mandate").

¶ 8. When maintenance work disrupts the normal flow of traffic, the MUTCD grants AOT considerable discretion to determine what type of temporary traffic control is necessary. The standard in

§ 6A.01 provides that "[t]emporary traffic control plans and devices shall be the responsibility of the authority of a public body or official having jurisdiction for guiding road users." *Id.* § 6A.01. The supporting language in the same section identifies broad goals for the implementation of temporary traffic zones, including the safety of workers and road users and recognizes that "[n]o one set of temporary traffic control devices can satisfy all conditions for a given project," and that "defining details that would be adequate to cover all applications is not practical." *Id.* For this reason, the MUTCD does not mandate the use of flaggers in any particular situation. See *id.* § 6E (providing standards that need to be followed *if* and *when* AOT elects to use flaggers in a given situation). Furthermore, the MUTCD grants AOT discretion to determine whether it is appropriate to switch traffic signals from steady mode to flashing mode. The standard in § 4D.12 states that "[t]he transition from steady mode (stop-and-go) to flashing mode, if initiated by a conflict monitor (malfunction management unit) or by a manual switch, *shall be permitted to be made at any time.*" *Id.* § 4D.12 (emphasis added).

¶ 9. Plaintiff argues that the MUTCD specifically required Velander to consider the volume of traffic, the complexity of the intersection, and road user safety before choosing to employ flashing lights as a temporary traffic control. Plaintiff points to the standard in § 6B.01, which states that "[t]he control of road users through a temporary traffic control zone shall be an essential part of . . . maintenance operations." *Id.* § 6B.01. However, plaintiff loads more upon the MUTCD than it can bear. The provision relied upon by plaintiff merely suggests that AOT employees "will have to make discretionary judgments about how to apply concretely the aspirational goal embedded in the statement." *Shansky v. United*

*States,* 164 F.3d 688, 691 (1st Cir. 1999) (holding that a National Park Service guideline providing that "the saving of human life will take precedence over all other management actions" did not prescribe a specific course of action for the installation of handrails and warning signs). We hold that the standard in § 6B.01 of the MUTCD does not prescribe a specific course of action for AOT employees to follow, but rather requires them to exercise "an element of judgment or choice" when selecting from competing temporary traffic controls. *Gaubert,* 499 U.S. at 322.

¶ 10. We turn next to the question of whether the choice of temporary traffic controls is "grounded in the policy of the regulatory regime." *Id.* at 325. When, as here, a regulation authorizes a government employee to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Lane,* 174 Vt. at 225, 811 A.2d at 195 (citing *Gaubert,* 499 U.S. at 324). While plaintiff concedes that the choice of temporary traffic controls, even if negligent, "involve[s] a judgment or choice that [is] grounded in safety considerations for road users and workers," plaintiff attempts to overcome the presumption by pointing to Velander's self-proclaimed rule for maintenance operations — "if we're not in the road, the flash controls the intersection" — as evidence that Velander's choice exclusively focused on worker safety and was not grounded in the policies of the MUTCD. Even considering this evidence of subjective intent at face value, it does not prove that Velander did not consider road user safety. Rather, the statement shows only that, in his experience, his weighing of the risks associated with placing additional workers in proximity to moving traffic has resulted in this manner of traffic control. We do not draw any inference from his failure to enumerate road user safety as a factor in his

decision because we do not require the government "to produce evidence that it made a conscious decision, based upon policy considerations." *Searles*, 171 Vt. at 565, 762 A.2d at 815. To require such an articulable rationale for every choice of temporary traffic control would be "unduly burdensome." *Id.*

¶ 11. Furthermore, plaintiff's argument misses the mark because "[w]hat matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy." *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995); see also *Shansky*, 164 F.3d at 692 (considering plaintiff's attempt to rebut the *Gaubert* presumption by emphasizing the actual decision-making process to be "beside the point"). While "[e]vidence of the actual decision may be helpful in understanding whether the 'nature' of the decision implicated policy judgments," *Cope*, 45 F.3d at 449 (quoting *Gaubert*, 499 U.S. at 325), "the issue is not the decision as such, but whether the 'nature' of the decision implicates policy analysis," *id.* (quoting *Gaubert*, 499 U.S. at 325). Plaintiff admits that the choice of temporary traffic controls is "grounded in safety considerations for road users and workers." The choice to employ alternate forms of temporary traffic controls, such as flaggers or advance warning signs, also involves increased costs and extends the duration of maintenance operations, thus disrupting the normal flow of traffic for a longer period of time than may have been otherwise necessary. Where the same maintenance work can be accomplished at less expense and with greater levels of safety for workers and the traveling public, the decision must be said to be "susceptible to policy analysis." *Gaubert*, 499 U.S. at 325.

¶ 12. Plaintiff argues, however, that negligence that results from the lack of care or attention is not immunized. She relies on *Andrulonis v. United States*,

952 F.2d 652 (2d Cir. 1991), and *Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000), in support of her argument, but both cases are easily distinguishable from the present situation. In *Andrulonis*, a bacteriologist who contracted rabies while conducting a laboratory experiment argued that his government supervisor failed to warn him about dangerous research conditions. 952 F.2d at 653. In denying the government's motion for summary judgment, the Second Circuit Court of Appeals reasoned that there was "neither a regulatory framework nor a defined policy that could serve as the basis for infusing all decisions of [Center for Disease Control] employees with policy implications." *Id.* at 655. The court continued, "it is hardly conceivable that the CDC would ever have a policy to keep silent about obvious, easily-correctable dangers in experiments using drugs supplied by the CDC." *Id.* Similarly, in *Coulthurst*, a federal prisoner who was injured when a machine cable snapped while he was lifting weights alleged that his injury was caused by a government employee's "fail[ure] to diligently and periodically inspect the weight equipment." 214 F.3d at 108. There, the court reasoned that a failure to inspect weight-room equipment or an "absent-minded or lazy failure to notify the appropriate authorities upon noticing the damaged cable" involved types of negligence "unrelated to any plausible policy objectives." *Id.* at 111. In those two cases, there was no plausible policy that would authorize research directors to "keep silent about obvious, easily-correctable dangers," *Andrulonis*, 952 F.2d at 655, or weight-room employees to "take a smoke break rather than inspect the machines," *Coulthurst*, 214 F.3d at 111. The difference between those cases and the present one is that the MUTCD specifically authorizes AOT employees to make decisions about what manner of temporary traffic control to

use in a given situation. MUTCD § 6A.01. The regulatory framework of the MUTCD thus serves as the basis for infusing the choice of temporary traffic controls with policy considerations, such as worker safety and road user safety, and insulating the choice from liability — even if negligent — under the discretionary function exception.

¶ 13. We acknowledge some difficulty in discerning the scope of the *Gaubert* test and whether it adequately protects the interests of citizens injured by the acts of government employees. See, e.g., *Andrulonis*, 952 F.2d at 655 (arguing that a broad reading of *Gaubert* "would effectively insulate virtually all actions by a government agent from liability, excepting only those where the agent had acted contrary to a clear regulation"); *Cope*, 45 F.3d at 448 (noting that application of the discretionary function exception "is admittedly difficult, since nearly every government action is, at least to some extent, subject to policy analysis") (quotations omitted). In *Estate of Gage*, we discussed the distinction between "ministerial maintenance decisions" and the types of policy judgments protected by the exception. 2005 VT 78, ¶ 12. Justice Scalia explained this distinction in his concurring opinion in *Gaubert* and argued that governmental choices are insulated from liability "if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations." 499 U.S. at 335 (Scalia, J., concurring). Thus:

> [a] dock foreman's decision to store bags of fertilizer in a highly compact fashion is not protected by this exception because, even if he carefully calculated considerations of cost to the Government vs. safety, it

was not his responsibility to ponder such things; the Secretary of Agriculture's decision to the same effect *is* protected, because weighing those considerations is his task.

*Id.* at 335-36. Velander's choice of temporary traffic controls was more than a ministerial maintenance decision because it is his responsibility to "ponder such things" as worker safety and road user safety. The MUTCD vests the responsibility for temporary traffic control in "a public body or official having jurisdiction for guiding road users." MUTCD § 6A.01 (emphasis added). The parties do not dispute that Velander covers traffic signal maintenance statewide as the only Level Three (the highest designation) traffic signal technician in the state. These job duties "regularly require[] judgment as to which of a range of permissible courses is the wisest." *Gaubert*, 499 U.S. at 325. For these reasons, we hold that Velander's choice of temporary traffic controls was a discretionary function within the meaning of the Vermont Tort Claims Act.

*Affirmed.*