ROBERTS, J.,
for the Court:
¶ 1. Through his grandparents and guardians, Q.A. sued the Pearl Public School District (PPSD) after Q.A. was injured during an after-school activity. The Rankin County Circuit Court granted PPSD’s motion for summary judgment on the basis that PPSD was immune from suit by virtue of the discretionary-function provision of the Mississippi Tort Claims Act (MTCA). Aggrieved, Q.A. appeals and argues that the circuit court erred when it concluded that there were no genuine issues of material fact that the discretionary-function provision of the MTCA applied. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. Q.A.’s injury occurred after a meeting of the Naval Junior Reserve Officer’s Training Corps (ROTC) at Pearl High School. Q.A., then seventeen years old, *1075 and T.B. were both cadets in the ROTC, an after-school activity for which they received course credits. Before an ROTC meeting, T.B. moved his car from the student parking lot to an area characterized as the “bus parking lot” so it would be closer when the ROTC meeting was over. During his deposition, T.B. explained that a portion of that parking lot was “where the teachers would normally park during school hours, but it was empty, so [ROTC cadets] parked there.”
¶ 3. After the ROTC meeting, T.B. left the school building and walked to his car so he could leave the campus for the day. The events that followed led to Q.A.’s lawsuit. During his deposition, T.B. testified:
And so myself and several of the other cadets who had pulled to the front or were waiting on rides went to the bus parking lot, and we all just kind of sat around and talked momentarily. Some of the students, their parents came and picked them up, and so I got — we were talking, [Q.A.] and I were, and he had sat on my car.
And so I got in my car, and I was telling him, you know, “[Q.A.], I’m fixing to go.” And he was sitting on my car, and he wouldn’t get off. And I thought he was kidding at first. You know, we were just playing around like boys do. And I told him several — repeatedly several, several times, “[Q.A.], I’m leaving.” And I can’t remember exactly to the extent of what he had said, but he was like, “No, [I am] not getting off your car.” Just, you know — and I said, “[Q.A.], I’m fixing to crank up my car. I [have] got to go.”
And I cranked it up, and he still wouldn’t get off. I told him several times again, and I said, “Look, man, I’m changing to my song. I’m going home. I’m flipping through the radio. As soon as the song comes on, I’m getting out of here.” And he just sat on my car. And so the song came on, and I gently put the car into reverse and backed up. And he still wouldn’t get off, and [I] pulled it into drive.
And as I started pulling away, [Q.A.] was sitting Indian style, and he had ahold [sic] onto one of my windshield wipers. And as I pulled away, I made a slight turn, and I guess he just wasn’t prepared for it. And he lost his grip, and he fell off the hood of my car and hit his head on the asphalt. And as soon as I saw that he wasn’t — he was laying [sic] there and was not getting up, I immediately turned around, came back, parked the car, shot it into park and turned it off and got out there beside him, waited [until] the proper help came just to — I didn’t know what was going on, but I knew something bad had happened.
¶ 4. Beverly Glover had been parked nearby. While waiting on her granddaughter to be dismissed from a different after-school activity, Glover saw the events that led to Q.A.’s injury. During her deposition, she testified as follows:
[T.B.] was walking to his car, and [Q.A.] was walking with him. And they were just kind of — [Q.A.] mostly was jumping around and laughing and carrying on.
And [T.B.] got in the car, and [Q.A.] was jumping around at the door of the car and stuff. And [T.B.] said, “Man, I’ve got to go.” And [Q.A.] jumped up on the hood sitting down — just jumped up and sat down on the hood of [T.B.]’s car.
And [T.B.] kept saying — leaning out the window saying, “Come on, man, I’ve got to go. Get off the car. I’m not kidding. You’re going to make me late. I’m going to get in trouble.”
And he cranked the car up, and I think he even opened the door and got *1076 back out and said, “[Q.A.], man, get off the car. Seriously, you’re going to get me in trouble and make me late. I have got to go.” And [Q.A.] wouldn’t get off. He just kept laughing at [T.B.] and stuff.
So [T.B.] got back in the car, and he put the car in reverse. And I think I turned around then to see what they were doing. Instead of just looking in the mirror, I had turned around and was watching them. And [T.B.] was slowly backing the car up, as if to say to [Q.A.], “I’m serious that I’ve really got to go. Get off the car.” He was just backing up slow, to get him to get off, I guess.... And so [Q.A.] kind of rolled across the hood of the car, like he was going to roll across and stand up. But when he rolled across the hood of the car, then I didn’t see him anymore. He was on the ground.
¶ 5. During his own deposition, Q.A. explained that he had no memory of the events that led to his injury. However, he also explained that other students had told him that he was merely leaning on T.B.’s car, instead of sitting on it, but none of those students were deposed. In any event, Q.A.’s notice of claim described Q.A.’s injuries as follows:
[Q.A.] had a concussion and bleeding on the brain. He underwent brain surgery. [Q.A.] has a titanium plate at the surgery site. [He] was in the hospital for more than one week, and he missed about three additional weeks of school. [He] was unable to return to school until the first of November, 2007.[He] endured re-occurring headaches for a while. He had seizures while in the hospital, and he had problems with short term memory. [Q.A.] has undergone a period of depression, and he still suffers bouts of depression. He also suffers anxiety, anger, embarrassment[,] and humiliation, and he has a permanent scar as a results [sic] of his injury.
Although not mentioned in Q.A.’s notice of claim, Q.A. stated during his deposition that he lost his senses of taste and smell when he hit his head.
¶ 6. Through his grandparents and guardians, Q.A. sued PPSD and claimed that it was negligent because it had failed to monitor the student parking lot or have “teachers, campus security, or administrators present after [ROTC] practice; and [it][had] fail[ed] to block the parking lot and deny access after school hours.” Q.A. requested approximately $970,000 in damages. PPSD denied that it was liable. It later filed a motion for summary judgment and argued that there were no genuine issues of material fact regarding whether it was immune from suit by virtue of the MTCA. The circuit court agreed, granted Pearl’s motion for summary judgment, and dismissed Q.A.’s suit with prejudice. Aggrieved, Q.A. appeals.
STANDARD OF REVIEW
¶ 7. Under the circumstances, our standard of review is as follows:
This Court utilizes a de novo standard to review the trial court’s grant or denial of summary judgment. Evidence will be analyzed in the light most favorable to the party opposing the motion. The pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, properly before the trial court, will be reexamined by this Court in order to determine if there is any genuine issue of material fact. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
Strange ex rel. Strange v. Itawamba County Sch. Dist., 9 So.3d 1187, 1189 (¶ 5) *1077 (Miss.Ct.App.2009) (internal citations and quotations omitted).
ANALYSIS
¶ 8. This appeal turns on the application of the MTCA, which provides that the State of Mississippi and its political subdivisions “are not now, have never been and shall not be liable, and are ... immune from suit” for its wrongful or tortuous acts or omissions. Miss.Code Ann. § 11-46-8(1) (Rev.2002). However, the MTCA waives sovereign immunity for claims arising out of the torts of governmental entities and their employees while acting within the course and scope of their employment. Miss.Code Ann. § 11-46-5(1) (Rev.2002).
¶ 9. A school district is considered a “political subdivision” and a “governmental entity” under the MTCA. Miss.Code Ann. § ll-46-l(g) and (i) (Supp.2011). The MTCA provides that certain circumstances are exempted from this waiver of immunity; thus, the governmental entity is not liable. See Miss.Code Ann. § 11-46-9 (Supp.2011). One such instance is when a governmental entity and its employees, acting within the course and scope of their employment, have a claim against them “[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee ... whether or not the discretion be abused.” Miss.Code Ann. § ll-46-9(l)(d) (Supp. 2011).
¶ 10. We must, therefore, determine whether PPSD’s duty to monitor parking lots while after-school activities are being dismissed implicates a discretionary duty. In Jones v. Mississippi Department of Transportation, 744 So.2d 256, 260 (¶ 11) (Miss.1999) (citing United States v. Gaubert, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)), the Mississippi Supreme Court adopted the two-part “public policy function” test to determine if governmental conduct is discretionary. First, it must be determined whether the act at issue involved “an element of choice or judgment.” Id. at 260 (¶ 10) (citation omitted). If so, it must then be determined “whether the choice involved social, economic, or political policy.” Id.
¶ 11. We conclude there is no genuine issue of material fact regarding whether the decision to supervise the parking lot at issue in this case involved an element of choice or judgment. As PPSD notes, no Mississippi statute mandates that a school district monitor a parking lot more than an hour after school. Similarly, no Mississippi statute requires that a school district assume that students leaving an after-school activity are behaving in a disorderly manner when there are no reports of such behavior. It is important to note there is no evidence that PPSD ignored reports that ROTC students engaged in disorderly conduct after being dismissed from ROTC meetings. In fact, there is no evidence in the record to contradict the conclusion that Q.A.’s injury was the first such report of any conduct that could be described as disorderly.
¶ 12. We further find that there are no genuine issues of material fact regarding the second prong of the discretionary-function test. That is, there are no genuine issues of material fact regarding whether PPSD’s decision not to have teachers or administrators monitoring the parking lot at issue involved economic policy. The second prong protects:
discretionary actions or decisions based on considerations of public policy. The purpose is to “prevent judicial ‘second guessing’ of legislative and administrative decisions grounded in social, eco *1078 nomic, and political policy through the medium of an action in tort.” The pertinent inquiry, then, is whether the decision “implicates the exercise of a policy judgment of a social, economic, or political nature.”
Strange, 9 So.3d at 1191 (¶ 11) (quoting Dotts v. Pat Harrison Waterway Dist., 933 So.2d 322, 327 (¶ 15) (Miss.Ct.App.2006)) (internal citations omitted). This Court further noted that it was mindful that “application of the public policy prong of the discretionary function test does not require proof of the thought processes of pertinent decision makers. Rather, the focus is on the nature of the actions taken, and whether they are susceptible to policy analysis.” Id. at (¶ 12) (quoting Dotts, 933 So.2d at 328 (¶ 16)) (internal citations omitted). “[0]nly those functions which by nature are policy decisions, whether made at the operational or planning level, are protected.” Id. (quoting Stewart ex rel. Womack v. City of Jackson, 804 So.2d 1041, 1047 (¶ 11) (Miss.2002)).
¶ 13. PPSD would be forced to pay employees overtime to monitor the parking lot and every other conceivable place where students could engage in disorderly conduct during after-school hours until verifying that every single student had left the campus. Alternatively, PPSD would be required to cut the time that employees could allocate to after-school activities because it would be necessary for teachers and administrators to spend a significant amount of time attempting to monitor the numerous places where students could be after being dismissed from after-school activities. Consequently, PPSD had to apply its discretion when deciding whether it should require teachers and/or administrators to remain on the school’s campus to monitor students who were being dismissed from after-school activities. It follows that PPSD is immune from suit by virtue of the MTCA’s provision regarding immunity for discretionary functions.
¶ 14. Q.A. argues that PPSD’s duty to supervise students was ministerial, based on the following language contained within Mississippi Code Annotated section 37-9-69 (Rev.2007), which states:
It shall be the duty of each superintendent, principal, and teacher in the public schools of this state to enforce in the school the courses of study prescribed by law, or by the state board of education, ... and to observe and enforce the statutes, rules[,] and regulations prescribed for the operation of schools. Such superintendents, principals^] and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess.
It bears mentioning that section 37-9-69 requires that school administrators and teachers “hold ... pupils to strict account for disorderly conduct ... on the way from school.” Section 37-9-69 does not require administrators and teachers to guarantee that no students will be injured due to unforeseeable disorderly conduct.
¶ 15. Nevertheless, this Court recently rejected a similar argument regarding ministerial duties in Strange, 9 So.3d at 1193 (¶ 20). The plaintiff in Strange had been injured after he fell out of the back of a pickup truck while riding from class to football practice. Id. at 1188 (¶2). Arguing that the school had a ministerial duty to supervise students, the plaintiff in that case claimed, based on L.W. v. McComb Separate Municipal School District, 754 So.2d 1136, 1145 (¶ 37) (Miss.1999): “7‘there [was] a ministerial aspect’ because state and federal law place a duty of ordinary care on school personnel to minimize risk of personal injury and to provide a safe school environment.” Strange, 9 So.3d at 1192 (¶ 13). This Court held:
*1079 [Wjhile there may be a fact issue regarding whether “surfing” (not just riding) in the back of a pickup truck could be considered “disorderly conduct” within the meaning of the statute, we find this analysis improper. First, there is no evidence that the school’s personnel knew students were committing the behavior at issue, as they did in L.W. and merely did nothing about it. If the District personnel had actually seen [the student] surfing in the back of a moving pickup and done nothing to stop it, there may have been a fact issue regarding whether they used ordinary care to prevent disorderly conduct under section 37-9-69.
Id. at 1192-93 (If 19). In L.W., the supreme court found that the discretionary-function exemption of Mississippi Code Annotated section ll-46-9(l)(d) did not apply because: two teachers had heard one student threaten another student during two separate instances; those two teachers did nothing about those two threats; and after school on the same day that the aggressor student had made the threats, the aggressor student beat and sexually assaulted the other student whom he had threatened. Id. at 1137 (¶¶2-3), 1142 (¶ 27). The supreme court found that Mississippi Code Annotated section 37-9-69 applied and that school personnel could have and should have prevented the disorderly conduct at the school. Id. at 1142 (¶ 25). The school’s knowledge of the threats by one student against another student — and the school’s failure to do anything to hold the aggressor student accountable for his disorderly conduct— eliminated any discretionary function by the school, so the application of the statute made the decision “ministerial,” and the school was not immune. Id. at 1142 (¶ 27). Similarly, in Lang v. Bay St. Louis/Waveland School District, 764 So.2d 1234 (Miss.1999), the Mississippi Supreme Court held that a school district had a ministerial duty to “hold students to strict account for disorderly conduct at school” after a student who had been sitting on a seven-foot wall fell and injured himself while attempting to avoid an altercation with other students. Id. at 1235 (¶ 3), 1241 (¶ 29). Although not discussed as part of the supreme court’s reasoning that the discretionary-function provision did not apply in Lang, there was evidence in that case that: students frequently sat on the wall; there were no written rules or signs that prohibited students from sitting on the wall; and students were sometimes told to get down from the wall. Id. at 1242 (¶ 34).
¶ 16. Here, there is no evidence PPSD had notice or reason to believe ROTC cadets or any other students were behaving in a disorderly manner in the parking lot at issue after ROTC meetings. There is, likewise, no evidence PPSD had reason to believe that students who parked in the parking lot at issue behaved in a manner that required supervision. Having found there are no genuine issues of material fact regarding either of the two-prong tests outlined in the discretionary-function test, we find that the discretionary-function provision of the MTCA provides PPSD with immunity from Q.A.’s claim. It follows that we affirm the judgment of the circuit court.
¶ 17. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, ISHEE, CARLTON AND RUSSELL, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT. MAXWELL, J„ NOT PARTICIPATING.