*Godin v. Corrections Corp. of America et al.*, No. 364-10-16 Frcv (Harris, J., Aug. 25, 2017).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Franklin Unit | Docket No. 364-10-16 Frcv |

David Godin,
     Plaintiff,

v.

Corrections Corporation of America,
Vermont Department of Corrections,
Lisa Menard, in her official capacity,
Andrew Pallito, in his individual and official capacity,
Richard Byrne, in his individual and official capacity,
     Defendants.

### DECISION AND ORDER: STATE DEFENDANTS' MOTION TO DISMISS

This matter comes before the Court on the State of Vermont Defendants' Motion to Dismiss the Complaint filed by David Godin ("Plaintiff") on October 20, 2016. The State of Vermont Defendants, represented by the Office of the Attorney General, David R. Groff, Esq.,[1] include the Vermont Department of Corrections ("DOC"); Lisa Menard, in her official capacity; Andrew Pallito, in his official and individual capacity; and Richard Byrne, in his official and individual capacity (collectively, "State Defendants"). Plaintiff is represented by Andrew H. Montroll, Esq.

### I: Statement of Facts

Taking all allegations stated in the Complaint as true, and viewing them in the light most favorable to Plaintiff, the nonmoving party, the relevant facts are as follows.[2] Plaintiff was sentenced to a term of incarceration in 2010 and placed in the custody of the DOC. Though initially incarcerated in Vermont, Defendant was transferred by the DOC into the custody of the Corrections Corporation of America ("CCA"), a corporation which operates a private prison located in Beattyville, Kentucky, called the Lee Adjustment Center ("LAC").

---

[1] The State Defendants were originally also represented by Assistant Attorney General Sally Adams, Esq., who withdrew her appearance in this matter on April 19, 2017.

[2] The State Defendants argue that the Court may not take judicial notice of the five articles attached to Plaintiff's Complaint. (State Defs.' Mot. at 3–4). It is unnecessary to delve too far into the State Defendants' argument. The Court here considers only those factual allegations stated in the Complaint, and accepts all facts stated therein as true, even if they cite to the attached articles. See *Rheaume v. Pallito*, 2011 VT 72, ¶ 2, 190 Vt. 245; *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 5, 184 Vt. 1.

The DOC entered into a contract with CCA to house Vermont prisoners at the LAC in 2004, and subsequently renewed that contract in 2007 and 2011. Staff at the LAC receive less training than staff in Vermont prisons and are fewer in number, as Vermont maintains one guard per unit and at the LAC one guard oversees multiple units. The LAC also does not provide the same level of medical, mental health, or other rehabilitative services as are provided in Vermont prisons. The LAC also maintains lax policies on the possession of razor blades by inmates, and fails to adequately monitor illegal drug use by prisoners, including the production of alcohol in the LAC by inmates using sugar. Guards made no effort in general to maintain order at the LAC. These policies created a high risk of harm to inmates at the LAC.

Just after Vermont contracted to send prisoners to the LAC, in late 2004, a major riot broke out there and two buildings were set on fire. In 2006, a Vermont inmate at the LAC was severely cut by another inmate wielding a razor-blade shank. In 2008, an inmate at the LAC reported finding a razor blade in his food. In March of 2013, former inmates at the LAC testified before the Vermont House Institutions and Corrections Committee concerning the high levels of violence between inmates and staff, the lack of treatment programs, frequent assaults, a lack of medical care, and plentiful illegal drugs at the facility. In the summer of 2013, an inmate at the LAC was cut by another inmate wielding a razor-blade shank, and another inmate was beaten by an inmate using an improvised weapon called a "lock in a sock."

Plaintiff alleges that Defendants DOC, Pallito, and Byrne "clearly knew that the [LAC] was woefully understaffed and significantly more dangerous than Vermont prisons" and that "prisoners at the [LAC] faced a much higher risk of harm, injury or death than prisoners housed in Vermont." (Compl. ¶ 39). Defendant Byrne has conceded knowledge that prisoners in Kentucky received less supervision than in Vermont prisons. Defendant Byrne also testified before the Vermont House Committee that it is cheaper to house prisoners in the LAC because there are fewer staff and they are paid less than staff in Vermont prisons. Despite this knowledge, the DOC, Pallito, and Byrne continued to contract with CCA to house Vermont prisoners to save money.

Plaintiff was transferred in April 2012 to the LAC, and on October 21, 2013, Plaintiff was attacked by another inmate, who sliced Plaintiff's face and neck with a razor-blade shank. No guards were in the immediate area of the location of the attack, and none came to Plaintiff's aid. He ran to the infirmary, where he was given towels for his wound, and emergency services were called. An emergency transport helicopter arrived, but could not be used to transport Plaintiff to a hospital because the guard assigned to travel with Plaintiff was too heavy for the helicopter. Plaintiff was then placed in an ambulance and driven to the nearest hospital, which took significantly longer than the helicopter ride would have. He was then transferred to a second hospital, as the first lacked facilities to treat Plaintiff's injury, where he received 139 stitches and 29 staples to close his wound. Plaintiff has a permanent loss of feeling in his face, a significant scar which has affected his ability to obtain employment, and suffered emotional distress as a result of his injury.

## II: Conclusions of Law

The State Defendants move to dismiss the Complaint pursuant to V.R.C.P. 12(b)(1) and (6) "because the claims are barred by sovereign immunity as the acts alleged in the Complaint are discretionary functions of state employees and because DOC Commissioners enjoy absolute immunity from suit for official conduct." (State Defs.' Mot. at 1). Rule 12 provides that "the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, [and] (6) failure to state a claim upon which relief can be granted." V.R.C.P. 12(b). Concerning a motion to dismiss under 12(b)(1) for lack of subject matter jurisdiction, the standard is as follows:

> A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a … [court] may refer to evidence outside the pleadings. A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (internal citations omitted); see *Rheaume v. Pallito*, 2011 VT 72, ¶ 2, 190 Vt. 245 ("Dismissal for lack of subject matter jurisdiction under Civil Rule 12(b)(1) is reviewed de novo, with all uncontroverted factual allegations of the complaint accepted as true and construed in the light most favorable to the nonmoving party.").

Concerning a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Vermont Supreme Court has outlined the relevant standard for review as follows:

> In determining whether a complaint can survive a motion to dismiss under Rule 12(b)(6), courts must take the factual allegations in the complaint as true, and consider whether "it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief."

*Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 5, 184 Vt. 1 (internal citations omitted).

### A: Immunity from Suit

The State Defendants have raised as defenses to this litigation various forms of statutory and common law immunity from suit, including sovereign immunity for the DOC, and official immunity for defendants Menard and Pallito acting in their official capacities.[3] Plaintiff argues

---

[3] The State Defendants failed to make any argument concerning the application of qualified immunity to defendant Byrne, see *Levinsky v. Diamond*, 151 Vt. 178, 185 (1989) (defining the factors to be considered in analyzing whether a "lower-level officer," employee, or agent of the State is entitled to qualified immunity from suit.), and thus the Court does not address its application. *Huminski v. Lavoie*, 173 Vt. 517, 519–20 (2001) (reversing district court's dismissal of plaintiff's suit on grounds of immunity not raised by defendants, holding that "sua sponte

that the State Defendants' assertion of immunity to his claims is repugnant to Articles 4 and 6 of the Vermont Constitution. Moreover, Plaintiff argues that the State has waived its immunity as to his claims, and that defendants Pallito and Menard were acting outside the scope of their authority, and thus are not immune from suit. Plaintiff further alleges that a policy of insurance exists which might cover his claims, in which case the exceptions to the waiver of immunity do not apply. The Court will first address Plaintiff's arguments concerning the Vermont Constitution, and then consider the applicability of the various immunity provisions.

### 1: Analysis of the Vermont Constitutional Arguments

Plaintiff argues that the application of sovereign and official immunity in this case deprives him of access to the judicial process in violation of Article 4 of the Vermont Constitution. He argues that the Vermont Constitution rejected the inclusion of the broad sovereign immunity contained in 12 V.S.A. §§ 5601–02 and the common law, in favor of a more limited immunity contained in Article 14 concerning legislative debate. Additionally, he appears to argue that the passage of §§ 5601, et al., represents an action beyond the scope of the Legislature's authority as stated in Chapter II, § 6 of the Vermont Constitution, in that it violates Article 4's right of access provision. Finally, that the common law of England providing for immunity is repugnant to Article 4, and thus, pursuant to 1 V.S.A. § 271, should not have been incorporated into Vermont's body of law. Each of these arguments stems from the premise that sovereign and official immunity is violative the provisions of Article 4, and thus the Court begins its analysis with this issue.

Article 4 provides that "[e]very person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which one may receive in person, property or character...." Vt. Const. ch. I, art. 4. "We have considered Article 4 the equivalent to the federal Due Process Clause." *Quesnel v. Town of Middlebury*, 167 Vt. 252, 258 (1997) (citing *Levinsky v. Diamond,* 151 Vt. 178, 197 (1989)). The Court has stated that this provision "does not create substantive rights," but rather "merely provides access to the courts." *Id.* (citing *Shields v. Gerhart,* 163 Vt. 219, 223 (1995)); see, e.g., *Levinsky*, 151 Vt. at 197 ("As such it protects recourse to the judicial process but does not rise to the level of establishing a fundamental privacy right, and we decline to do so here."); *In re Stoddard*, 144 Vt. 6, 8 (1983) ("If we were to hold that there is no right of review, we would, in effect, be precluding Stoddard from any right of review at all. This would clearly be contrary to Stoddard's guaranteed right to a remedy at law. Vt. Const. Ch. I, Art. 4." (certain citations omitted)). However, "[w]here a substantive right—e.g., a property interest—already exists, conferred by statute or common law, Article 4 can protect a plaintiff against deprivation of that right without due process."[4] *Nelson v. Town of Johnsbury Selectboard*, 2015 VT 5, ¶ 44, 198 Vt. 277, 297.

---

dismissals without adequate notice to the parties tend to short-circuit the process, and ultimately to prolong the proceedings and squander judicial resources").

[4] The Court has stated that "[a]bsent due process violations, lawsuits against the state for acts essentially governmental in nature are barred unless the state waives its sovereign immunity and consents to be sued." *Denis Bail Bonds, Inc. v. State*, 159 Vt. 481, 484–85 (1993). A corollary of this holding would be that where a plaintiff

As noted by the State Defendants, Plaintiff is not denied complete access to the courts by the application of sovereign and official immunity. These doctrines do not prevent him from bringing suit against non-state actors, such as CCA or the perpetrator of the assault, or from state officials acting outside the scope of their authority, or to the extent not otherwise barred by these doctrines. He is not being denied "any right of review at all." *In re Stoddard*, 144 Vt. at 8. Rather, these immunity doctrines limit his ability to recover on his claims from certain classes of defendants. This does not amount to a violation of his constitutional right of access to the courts under Article 4. Cf. *Holton v. Dep't of Employment & Training (Town of Vernon)*, 2005 VT 42, ¶ 27, 178 Vt. 147 (rejecting argument that "the effect of the statutory scheme in depriving [plaintiff] of an appeal to this Court … violates Chapter I, Article 4 of the Vermont Constitution," and holding that "the effect of the statutory scheme on this case has not resulted in a violation of the federal constitution's Due Process Clause even though Vernon will not have access to an appellate law court in this case. Thus, a similar result should obtain under Article 4."); *USGen New England, Inc. v. Town of Rockingham*, 2003 VT 102, ¶ 40, 176 Vt. 104 ("Contrary to USGen's protestations, the freeze did not affect USGen's access to the judicial process: its right to bring a tax appeal pursuant to 32 V.S.A. § 4461—a right which USGen exercised and the exercise of which led to the current appeal—was left undisturbed by the legislative acts….the freeze narrowed the issues in the appeal by establishing a different 'law as to valuation' than is applicable for other property, but this was a change in the substantive law of valuation of taxable property and not a restriction on USGen's appeal rights.").

Further, though the Vermont Supreme Court has not expressly considered the interaction of Article 4 with the principles of sovereign and official immunity, the Court has considered general assertions that sovereign immunity is unconstitutional and rejected them. For example, in *Lomberg v. Crowley*, the Court stated:

> In addition, the plaintiff claims that the doctrine of sovereign immunity is unconstitutional and no longer a viable doctrine, on the authority of cases from the many jurisdictions where the doctrine has judicial origin. See, e. g., *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 402–06, 388 A.2d 709, 718–19 (1978). A statute is presumed to be constitutional, *Re Montpelier & Barre Railroad*, 135 Vt. 102, 103…(1977); *State v. Pray*, 133 Vt. 537, 541…(1975), absent an allegation to the contrary. In the case at bar, the plaintiff makes no specific claims of unconstitutionality, nor does he brief any. The presumption of validity is not overcome. It is true that many jurisdictions have abolished, and legal commentators have advocated abolition of, the doctrine of sovereign immunity where created by judicial decision. While not all legislative enactments concerning a doctrine which may have had a judicial origin will preclude its judicial abolition, there are instances in which doctrine has such clear legislative recognition, as is the

---

alleges a violation of due process, sovereign immunity does not apply to the suit. This appears to address in some way the interplay of Article 4 and the doctrine of immunity, though not expressly. As Plaintiff does not allege a violation of due process, the issue is tangential to the resolution of the argument.

case at bar, 29 V.S.A. s 1403, that we are bound to acknowledge its continuance until the legislature mandates otherwise. *Roman Catholic Diocese v. City of Winooski Housing Authority*, 137 Vt. 517, 520…(1979).

138 Vt. 420, 424 (1980)(upholding the state torts claim act against a challenge it was unconstitutional), overruled on other grounds by *Levinsky*, 151 Vt. at 183.

The Court has also discussed how the principles of sovereign and official immunity represent a balancing of competing interests, including the interest in ensuring plaintiffs have recourse to redress injuries by state officials. For example, in explaining the underpinnings for official immunity the *Levinsky* Court stated:

> The doctrine of official immunity has existed, in one form or another, throughout the history of Vermont jurisprudence. See, e.g., *Davis v. Strong,* 31 Vt. 332 (1858); *Gregory v. Bugbee,* 42 Vt. 480 (1869); *Banister v. Wakeman,* 64 Vt. 203…(1891); *Nadeau v. Marchessault,* 112 Vt. 309…(1942); *Polidor v. Mahady,* 130 Vt. 173…(1972).…

> We recognize that the use of the doctrine may, at times, produce harsh results. As the U.S. Supreme Court stated in *Imbler v. Pachtman* with respect to the immunity attaching to prosecutors under § 1983 actions,

>> [t]o be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

> 424 U.S. [409,] 427–28…[(1976)]. So, too, may the absolute immunity attaching under our state law to judges, legislators and "highest" public officials leave wronged plaintiffs without civil redress.

> …

> As Judge Learned Hand so aptly stated, it would be monstrous to deny recovery if it were possible, in practice, to confine complaints of wrongdoing to those in fact guilty of misuse of power or authority. *Gregoire v. Biddle,* 177 F.2d [579,] 581 [(2d Cir. 1949)]. Since that cannot be done, our answer has historically been, and continues to be, to attempt to balance the competing interests by delineating doctrines of immunity which will best allow public officials the freedom necessary to perform their obligations without fear of retaliation.

*Levinsky*, 151 Vt. at 198–99; see *Banister v. Wakeman*, 64 Vt. 203, 208 (1891) ("'Immunity from liability in favor of the judges rests upon the broad ground of public policy, which declares that a

judge, for acts done by him in his judicial capacity, is absolutely privileged from action. It is an official privilege, which, though it covers a multitude of sins, is still absolutely essential to the due administration of justice. It is a privilege not primarily designed for the protection of the judge, but for the protection of the public, by making the judges free, independent, and fearless in the discharge of their duties. No judge could act independently if conscious that he was exposed to an action by every disappointed suitor in his court. If a judge were liable to action, then the question whether he has properly discharged his judicial duties must be submitted to a jury to determine according to their notions. In like manner, the judge trying his case could be sued, his conduct reviewed, and so on *ad infinitum.*'" (quoting Judge Powers' dissent in *Vaughan v. Congdon*, 56 Vt. 111, 128 (1883)).

Thus, it cannot be said that the Court has not addressed how sovereign and official immunity affects plaintiffs' access to justice. It has decidedly weighed the costs to some plaintiffs who are denied a remedy by the doctrines against the public benefit provided by the doctrines. In balancing these competing interests, the Court has come out in favor of sovereign and official immunity. Assumedly, in considering how Article 4 specifically applies to these doctrines, given the Article's interpretation as merely guaranteeing access to the courts, but not offering any substantive rights in itself, the Court would apply this same balancing test and come to the same conclusion.

Moreover, the Vermont Supreme Court has looked to decisions of the New Hampshire Supreme Court interpreting a similar provision in its constitution. See, e.g., *State v. King*, 2016 VT 131, ¶ 31 (Vt. Dec. 23, 2016) ("Because the relevant article in New Hampshire's constitution [(N.H. Const. Pt. 1, art. 14.)] mirrors Article 4 of Vermont's constitution, we turned to a New Hampshire Supreme Court opinion to clarify our analysis of the clauses.")(Vermont Article 4 pre-accusation delay in prosecution analysis); *State v. Dean*, 148 Vt. 510, 515 (1987)(turning to New Hampshire Article 14 caselaw to analyze Vermont Article 4 in the speedy trial context). The New Hampshire Supreme Court has rejected arguments that sovereign immunity in its entirety is unconstitutional under its Article 14. *Merrill v. City of Manchester*, 332 A.2d 378, 381, 383 (N.H. 1974) (considering a challenge to municipal immunity, and holding in light of Article 14 that, nonetheless, municipalities remain "immune from liability for acts and omissions constituting (a) the exercise of a legislative or judicial function, and (b) the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion"); see *Opinion of the Justices*, 493 A.2d 1182, 1189 (N.H. 1985) (considering the constitutionality under Article 14 of a statutory grant of immunity and holding that the court "would uphold this provision to the extent that it immunizes the State in its exercise of an executive or planning function involving the making of a basic policy decision that is characterized by a high degree of official judgment or discretion"). The *Merrill* Court's discretionary function exception, to New Hampshire's otherwise abolishment of common law sovereign immunity, remains in effect. See *Maryea v. Velardi*, 168 N.H. 633, 135 A.3d 121 (2016). The common law discretionary function sovereign immunity that New Hampshire finds applicable despite its Article 14, is similar to the

legislative Section 5601(e)(1) discretionary function tort immunity exception the Vermont legislature created under the VTCA.

Albeit concerning the constitutionality of county rules barring defenses when not submitted with an affidavit, and considering Article 12's guarantee of a trial by jury and not Article 4's right of access, the Vermont Supreme Court's logic stated in *Jones v. Spear* is also relevant to this case:

> Rules similar in principle to the one in question have been enforced by the courts in this state from the earliest period of its judicial history down to the present time, as well as in all the neighboring states; and this is the first time, to our knowledge, that their right to do so has ever been questioned; and no evils are even pretended to have ever arisen from their operation. That evils very numerous and mischievous would result from an abandonment of such rules must be apparent to all acquainted with legal proceedings; and we think it would be very unwise, at this day, to abolish a practice sanctioned by immemorial usage, and highly beneficial and salutary in its operation, merely on account of a fancied, theoretical conflict with the right of trial by jury.

21 Vt. 426, 430 (1849). For similar reasons, the Court does not agree with Plaintiff's argument that the constitutional generalized right of access to the courts guaranteed in Article 4 overrides the policies behind the long-recognized doctrines of sovereign and official immunity that allow government and governmental officials perform their essential tasks with some degree of protection from suit. Without some specific Vermont caselaw indicating a different result, the Court therefore declines to address Plaintiff's other arguments that Article 4 so displaces sovereign and official immunities, as applied to the claims asserted here.

As to Plaintiff's arguments under Article 6, "Article 6 is but a truism of a republican form of government, and provides no private right of action. The remedy contemplated by it is that of popular election." *Welch v. Seery*, 138 Vt. 126, 128 (1980); *Rutland Herald v. Vermont State Police*, 2012 VT 24, ¶ 31, 191 Vt. 357. The Vermont Supreme Court has noted that it has not issued relief solely in the basis of Article 6 (*Rutland Herald, supra*), and barring Vermont precedent pointing otherwise, this court will do the same.

Plaintiff appears to have misconstrued the language in Article 6 holding elected officials accountable "in a legal way" as intending to authorize lawsuits against elected (and other) officials. The intent of the Constitution in this provision, as interpreted by the Vermont Supreme Court, is not to allow suit, but rather to allow the people to vote an official out of office. The court does not find reason or precedent to couple Article 6 with Article 4 to reach a result in this case that neither Article in itself supports. Thus Article 6 also does not appear to invalidate the application of immunity in this action.

The Court will therefore consider the application of sovereign and official immunity to Plaintiff's claims.

## 1: Sovereign Immunity

The State Defendants—both the DOC and all individual defendants in their official capacity—assert that they enjoy immunity from suit on Plaintiff's claims under the discretionary function exception to the Vermont Tort Claims Act ("VTCA"), found at 12 V.S.A. § 5601(e)(1).[5]

"Sovereign immunity protects the state from suit unless immunity is expressly waived by statute." *LaShay v. Dep't of Soc. & Rehab. Servs.*, 160 Vt. 60, 67 (1993). Sovereign immunity is a jurisdictional issue. See *City of S. Burlington v. Dep't of Corr.*, 171 Vt. 587, 590 (2000); see *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) ("[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III."); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 756 (2d Cir. 1998) ("'[S]overeign immunity is an immunity from trial and the attendant burdens of litigation[.]'…A sovereign that is required to litigate a case on the merits before it can appeal the assertion of jurisdiction over it has not been afforded the benefit of the immunity to which it is entitled." (internal citations omitted)). Plaintiff bears the burden of establishing that his claims fall within a waiver of sovereign immunity by a preponderance of the evidence. See *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *My Sister's Place v. City of Burlington*, 139 Vt. 602, 608 (1981) ("[S]overeign immunity is not considered an affirmative defense in Vermont."); see *Amy's Enterprises v. Sorrell*, 174 Vt. 623, 623–24 (2002) (noting plaintiff's failure to establish analog to private action, and thus that her claims fell within the waiver of immunity found in §5601(a)); but see *Óneill v. Rutland Cty. State's Attorneys Office*, No. 2:16-CV-196, 2016 WL 7494857, at *2 (D. Vt. Dec. 29, 2016) ("However, in cases where a governmental entity asserts the Eleventh Amendment as the basis of dismissal, the burden falls to that entity to prove its entitlement to immunity from suit." (citing *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.,* 466 F.3d 232, 237 (2d Cir. 2006), in which the Second Circuit joined other circuit courts in "holding that the governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity")).

As the Vermont Supreme Court has explained,

Under the Vermont Tort Claims Act, 12 V.S.A. § 5601(a), the State has waived its immunity for injury to persons caused by the negligent act or omission of a State employee while acting within the scope of employment, subject to certain delineated exceptions. One of these exceptions is set forth in § 5601(e)(1), which protects the State from any claim "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused." The purpose of the discretionary-function exception is to assure that courts do not

---

[5] The State Defendants do not argue that Plaintiff's claims are not encompassed by the waiver of immunity stated in 12 V.S.A. § 5601(a), see, e.g., *Kane v. Lamothe*, 2007 VT 91, ¶¶ 6 & 7 n.3, 182 Vt. 241, so the statutory exceptions the State Defendants raise as to the waiver of immunity are analyzed.

invade the province of coordinate branches of government through "judicial second guessing of legislative or administrative policy judgments."

*Estate of Gage v. State*, 2005 VT 78, ¶ 4, 178 Vt. 212 (internal citations omitted).

Vermont has adopted "the two-part test utilized by the United States Supreme Court for determining the applicability of the nearly-identical discretionary function exception in the Federal Tort Claims Act." *Id.* ¶ 5.

> This test, established in *United States v. Gaubert,* 499 U.S. 315, 322–23…(1991), first asks whether a statute, regulation, or policy specifically prescribes a course of action for the employee to follow. If so, then the discretion requirement is not met. *Id.* If, however, the acts involved are "discretionary in nature," involving "'an element of judgment or choice,'" the first prong of the test is satisfied. *Id.* at 322…. The court must then decide under the second prong whether that judgment involved considerations of public policy which the discretionary function exception was designed to protect. *Id.* at 323…. Under *Gaubert,* it is presumed that when a government agent is authorized to exercise discretion the agent's acts are grounded in policy when exercising that discretion. *Id.* at 324…. Thus, to survive a motion for summary judgment, a plaintiff must allege facts sufficient to overcome the presumption that the discretion involved policy considerations. *Id.* The focus of the court's inquiry, furthermore, is not on the official's specific subjective intent in exercising the discretion conferred, but on the general "nature of the actions taken and on whether they are susceptible to policy analysis."

*Estate of Gage*, 2005 VT 78, ¶ 5.

In this action, Plaintiff alleges that the State Defendants contracted with CCA to house Vermont prisoners to save money in terms of construction and overhead costs associated with building new Vermont prisons, all the while knowing that CCA's prisons, including the LAC, were less safe due to fewer and poorly-paid and -trained staff, no rehabilitative services and worse medical services, and lax rules concerning prisoners' possession of razor blades and other contraband. Essentially, Plaintiff challenges the decision made by the DOC and defendants Pallito, Menard, and Bryne to contract with CCA. As a result of this decision to contract with CCA, Plaintiff claims that he was sent to the LAC and was assaulted by another inmate wielding a razor blade, resulting in what Plaintiff characterizes as exactly the type of injury to be expected as a result of allowing Vermont prisoners to be housed in such a facility.

As to the first prong of the analysis, the Court must determine whether "a statute, regulation, or policy specifically prescribes a course of action for the employee to follow." *Estate of Gage*, 2005 VT 78, ¶ 5. The scope of authority of the Commissioner of the Department of Corrections is found in 28 V.S.A. § 102, and includes the authority "[t]o contract for services … to carry out the functions of the Department" and "[t]o order the assignment and transfer of persons committed to the custody of the Commissioner to correctional facilities, including out-

of-state facilities." 28 V.S.A. § 102(5) & (11). Indeed, in *Daye v. State*, the Supreme Court stated that the authority to enter into a contract to transfer prisoners to out-of-state facilities "was well within the powers reasonably and necessarily implied by the Commissioner's fundamental obligation to maintain prison safety and order, and the Commissioner's express and unfettered statutory authority to designate, assign and transfer inmates." 171 Vt. 475, 479 (2000). Thus, as concerns the contracting of services for the out-of-state incarceration of Vermont inmates, there does not appear to be a statute, regulation, or policy prescribing a course of action. Rather, this decision appears to be within the discretion of the relevant authority.

Plaintiff argues that the State Defendants were acting in accordance with regulations proscribing a particular course of action, specifically that the DOC has regulations concerning staffing levels, training of prison guards, the provision of services, and rules concerning the possession of alcohol and razor blades in Vermont prisons. However, the claims against the State Defendants do not concern their particular actions in following or not following these regulations, but rather in their conduct in contracting with an out-of-state, private prison to house Vermont prisoners, including Plaintiff, that did not ascribe to these same standards. Thus, Plaintiff is complaining not of any particular individual's failure to follow a specific course of action, see, e.g., *LaShay*, 160 Vt. at 67 (considering a state employee's responsibility to report allegations of sexual abuse by a foster parent and holding that "if reporting were mandatory, it was a ministerial, not a discretionary duty"). Plaintiff's claims against the State Defendants arise out of their decision to send Vermont prisoners out of state in the first instance, and to CCA's facilities, including the LAC, in the second to save money. These are clearly decisions involving discretion. See *Johnson v. Agency of Transp.*, 2006 VT 37, ¶ 13, 180 Vt. 493 ("governmental choices are insulated from liability 'if the choice is, under the particular circumstances, one that ought to be informed by considerations of social, economic, or political policy and is made by an officer whose official responsibilities include assessment of those considerations.'" (quoting *Gaubert,* 499 U.S. at 335 (Scalia, J., concurring))); *Libercent*, 149 Vt. at 81 ("Our cases have defined a discretionary duty as one requiring the exercise of judgment in its performance, and a ministerial duty as one where 'nothing is left to discretion—a simple and definite duty, imposed by law, and arising under conditions admitted or proved to exist.'"). The Court thus moves on to the second prong of the analysis.

In considering the second prong, the Court looks to "whether that judgment involved considerations of public policy which the discretionary function exception was designed to protect." *Estate of Gage*, 2005 VT 78, ¶ 5. The Court also notes that "it is presumed that when a government agent is authorized to exercise discretion the agent's acts are grounded in policy when exercising that discretion." *Id.* "The focus of this analysis is on whether the actions taken are 'susceptible to policy analysis,' and not on the employee's 'subjective intent in exercising the discretion conferred by ... regulation.'" *Johnson v. Agency of Transp.*, 2006 VT 37, ¶ 6, 180 Vt. 493.

Here, it is clear that the decision to contract with a certain company to house Vermont inmates involves weighing considerations of public policy. As alleged by Plaintiff in the Complaint, the State Defendants weighed the costs of building and running new prisons versus

the sending of Vermont prisoners out of state and decided that the latter was the better option. Though Plaintiff contends that the State Defendants' decision was wrong and reflected an incorrect balancing of competing factors, "'[w]hat matters is not what the decisionmaker was thinking, but whether the type of decision being challenged is grounded in social, economic, or political policy.' While '[e]vidence of the actual decision may be helpful in understanding whether the "nature" of the decision implicated policy judgments,' 'the issue is not the decision as such, but whether the "nature" of the decision implicates policy analysis.'" *Johnson*, 2006 VT 37, ¶ 11 (quoting *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (internal citations omitted)). The *Daye* Court noted the Commissioner's decisions to transfer Vermont inmates out-of-state was made in response to the deleterious effects of overcrowding in Vermont jails, which in itself can lead to "continual" prison litigation. 171 Vt. at 479. The weighing of the pros and cons of differing placements for Vermont inmates is the type of decision that requires weighing of competing policies that implicate social and economic policies.

At least one other Vermont trial court has applied the discretionary function VTCA sovereign immunity waiver exception to claims against the DOC or State employees for injuries arising following transfer to a non-Vermont correctional facility. See *Haner v. DOC.*, 2009 WL 6557340, No. 327-5-09 Wrcv (Vt. Super. Ct., 7/30/09)(Eaton, J.).

Therefore, the actions by the State Defendants complained of by Plaintiff fall within an exception to 12 V.S.A. 5601(a), specifically subsection (e)(1), excepting "[a]ny claim…based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a State agency or an employee of the State, whether or not the discretion involved is abused," meaning that the State has not waived its sovereign immunity concerning this cause of action.

In his Opposition brief, Plaintiff argues that the State Defendants may not claim sovereign immunity under the exception listed in subsection (e)(1) because they have not established that that the commissioner of buildings and general services has not purchased a policy of liability insurance covering losses associated with his claims. See *id.* § 5601(f). However, Plaintiff did not allege in his Complaint, nor even in his opposition memorandum that such a policy exists; rather, he stated that he "must be given the opportunity to engage in discovery to make his own determination regarding the state's insurance coverage." (Pl.'s Opp'n at 13). Further, the State Defendants have disputed that such a policy exists. (State Defs.' Reply Mem. at 5, n.2). As a result, Plaintiff has not met his burden, stated *supra*, to establish evidence supporting his contention that the waiver of immunity found in § 5601(f) applies to his claims.[6]

---

[6] Plaintiff argues that he does not bear the burden of proof on the issue of sovereign immunity, citing dicta from *State v. St. Francis*, that "[s]overeign immunity must be proved by the party claiming it," which cites cases discussing claims of immunity by foreign states. 151 Vt. 384, 390 (1989). However, here, the State has proven that sovereign immunity applies under § 5601(e)(1); it is Plaintiff who raises subsection (f) as a waiver of sovereign immunity. Considering the factors articulated in *St. Francis*, particularly that "it is easier to prove the existence of a fact than the nonexistence of a fact," and that Plaintiff is the party to whom this fact is essential, see 151 Vt. at 388, in addition to all the law cited *supra*, it is appropriate that the burden lie with Plaintiff to assert the existence of a policy of insurance defeating the State's claim of sovereign immunity, particularly given the State Defendants' denial of the existence of such a policy.

See *Agency of Envtl. Conservation v. Casella*, 142 Vt. 503, 507 (1983) (rejecting claim that sovereign immunity was waived based on the existence of an insurance policy where "the pleader left the court below totally empty handed in this particular. No such circumstance was even suggested as a bar to the defense of sovereign immunity or in any way presented by pleadings or motion to that court. The possibility that the State even possesses insurance coverage which applies to this kind of activity is left entirely speculative."); cf. *LaShay*, 160 Vt. at 69–70 (finding waiver under § 5601(f) "to the extent that SRS has liability insurance coverage" where plaintiff maintained "that SRS has an insurance policy covering the claims herein"). Thus, the Court's determinations as to the application of sovereign immunity stated above stand.

"'Under the doctrine of sovereign immunity, claims against the State are barred unless immunity is expressly waived by statute." *Vanderbloom v. State Agency of Transp.*, 2015 VT 103, ¶ 6, 200 Vt. 150 (quoting *Kane v. Lamothe,* 2007 VT 91, ¶ 6, 182 Vt. 241). Plaintiff's claims against the DOC are thus barred under the doctrine of sovereign immunity and must be dismissed.

"When the act or omission of an employee of the state acting within the scope of employment is believed to have caused damage to property, injury to persons, or death, the *exclusive right of action* shall lie against the state of Vermont; and no such action may be maintained against the employee or the estate of the employee." 12 V.S.A. § 5602(a) (emphasis added). Thus, to the extent the individual State Defendants were acting within the scope of their employment, no such action may be maintained against them as they are "immune from suit."[7] *Bryan v. State*, No. 2016-267, 2017 WL 262001, at *2 (Vt. Jan. 12, 2017) (unpublished mem.); *Long v. L'Esperance*, 166 Vt. 566, 575 (1997) (noting that section 5602(a) "protect[s] state employees from suit by providing that under certain circumstances 'the exclusive right of action shall lie against the state of Vermont'").

"However, there is an exception in the Vermont Tort Claims Act which allows claims to be brought against an employee for gross negligence or willful misconduct, even if the conduct occurred within the scope of employment." *Amy's Enterprises*, 174 Vt. at 624 (citing 12 V.S.A. § 5602(b)). "In order to maintain a claim of gross negligence, a plaintiff must present facts that

---

[7] As stated in *Levinsky*, this does not amount to an extension of sovereign immunity to employees of the State. See 151 Vt. at 183. "[T]he defense of sovereign immunity is available in Vermont only as to the state itself, to the extent the state has not waived its immunity under the provisions of 12 V.S.A. § 5601….Official immunity, unlike sovereign immunity, is available in some circumstances to shield public officials from lawsuits against them based on their activities." *Id.* Section 5602(a) thus is a matter of pleading, as "under Vermont law, claims based on the actions of a state employee must generally lie against the state, not the individual employee who allegedly committed the harm." *Colby*, 2008 VT 20, ¶ 6; see *Tucker v. Decker*, No. 16-1018, 2017 WL 1041809, at *3 (2d Cir. Mar. 16, 2017) (affirming the district court's dismissal of plaintiff's tort claims against state trooper defendant on grounds that "[t]ort claims may be brought against the individual employee instead of the state only for the employee's 'gross negligence or willful misconduct.'" (citing § 5602(b))); *Bradshaw v. Joseph*, 164 Vt. 154, 156 (1995) ("Although exempted from classified state service, see 13 V.S.A. § 5254 (a), the origin, function and funding of public defenders lead us to conclude that they are state employees *and, as such, 12 V.S.A. § 5602 bars suit against them for acts or omissions occurring within the scope of their employment*." (emphasis added)).

show an individual defendant 'heedlessly and palpably violated a legal duty owed to plaintiff.'" *Id.* As concerns willful misconduct:

> A wilful or intentional injury implies positive and aggressive conduct, and not the mere negligent omission of duty. Ballentine's Law Dictionary, 3rd edition, page 669. Wilful means intentional and is used in contradistinction to 'accidental' or 'unavoidable.' A wilful act implies an intention to cause injury. *Anton v. The Fidelity & Casualty Company of New York*, 117 Vt. 300, 305. In its customary usage intentionally means an act done with intention of purpose, designed, and voluntary. Webster's Third New International Dictionary. See 46 C.J.S. pages 1106, 1107.

*Wendell v. Union Mut. Fire Ins. Co.*, 123 Vt. 294, 297 (1963).

Certain of Plaintiff's claims allege conduct that may constitute "gross negligence or willful misconduct" on the part of the individual State Defendants. Counts 2, 3, 4, 6, 9 and 10 do not. Counts 3, 6 and 9 are negligence based. Counts 2, 4 and 10 do not appear to state private causes of action recognized by the law, even if they the State Defendants may be claimed to have acted grossly negligent or with willful misconduct in some respects. (While Vermont common law recognizes strict liability in a few narrow circumstnaces, where common law in other cases have also applied tort strict liability, for the reasons cited in State Defendants' briefs the court agrees the doctrine does not apply to claims inmates may bring for conditions or injuries arising out of their confinement).

As noted some of the counts allege conduct that may constitute "gross negligence or willful misconduct". Count 1 alleges a violation of Plaintiff's rights under Chapter I, Article 18 and Chapter II, § 39 of the Vermont Constitution to be free from the infliction of cruel and unusual punishment. Though discussed further below, this claim, if otherwise valid, would appear to constitute a claim alleging at a minimum gross negligence. See *Farmer v. Brennan*, 511 U.S. 825, 835, 837 (1994) (considering liability under the U.S. Constitution for cruel and unusual punishment and holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," and stating that this standard "entails something more than mere negligence"). Count 5 alleges intentional infliction of emotional distress. Count 7 alleges assault resulting from the "intentional acts" of Defendants. Count 8 alleges battery as a result of the intentional acts and deliberate indifference of Defendants. As a result, these claims are not barred against the individual defendants by statute and are not dismissed. 12 V.S.A. § 5602(b). All other claims may not be maintained against the individual State Defendants. See *id.* § 5602(a).

2: Official Immunity for Defendants Pallito and Menard

The State Defendants contend that Defendants Pallito and Menard are protected from suit by a grant of absolute immunity for actions taken in their official capacity. As the Vermont Supreme Court has explained,

> Under some circumstances, official immunity shields state officials and employees from lawsuits based on their activities. We have recognized two degrees of official immunity: absolute immunity and qualified immunity. Absolute immunity applies to judges, legislators and the state's highest executive officers when they are acting within their respective authorities.

*LaShay*, 160 Vt. at 64 (internal citations omitted); see *O'Connor v. Donovan*, 2012 VT 27, ¶ 16, 191 Vt. 412 ("Vermont common-law immunity applicable to state law claims … provides absolute immunity for 'high executive' officials such as the Attorney General and agency heads for acts committed within the scope of their authority."). Because defendants Pallito and Menard, as Commissioners of the DOC, were the highest executive officer at the DOC, 28 V.S.A. § 102(a), they are entitled to absolute immunity, if they were acting within the scope of their authority. See *id.*; *Curran v. Marcille*, 152 Vt. 247, 249, (1989) (noting that the Commissioner of the Department of Corrections is among the state's highest executive officers and entitled to absolute immunity when acting within the scope of their authority). "That defendant was allegedly motivated by ill will or a malicious design…does not diminish the absolute immunity afforded conduct otherwise within the general scope of defendant's authority." *O'Connor*, 2012 VT 27, ¶ 27; *Levinsky*, 151 Vt. at 185 ("When available, absolute immunity applies to any and all acts performed within the individual's authority."). The Court must thus examine whether the actions complained of by Plaintiff fall within the scope of defendants Pallito and Menard's authority as Commissioners of the DOC.

Plaintiff's allegations against defendants Pallito and Menard[8] concern their decision to contract with CCA for the out-of-state housing of Vermont inmates. The Commissioner's scope of authority includes "[t]o contract for services … to carry out the functions of the Department" and "[t]o order the assignment and transfer of persons committed to the custody of the Commissioner to correctional facilities, including out-of-state facilities." 28 V.S.A. § 102(5) & (11); see *Daye*, 171 Vt. at 479 ("[T]he authority to enter into the Monmouth County contract was well within the powers reasonably and necessarily implied by the Commissioner's fundamental obligation to maintain prison safety and order, and the Commissioner's express and unfettered statutory authority to designate, assign and transfer inmates."). Thus, defendants Pallito and Menard, to the extent the Complaint alleges anything against them, were acting within the scope of their authority.

Plaintiff contends that the immunity does not apply to defendants Menard and Pallito because they created certain policies, and failed to enforce these policies at the LAC, and thus

---

[8] The Complaint contains no factual allegations concerning defendant Menard.

their actions were outside the scope of their authority. Plaintiff's argument, however, addresses not the <u>scope of the defendants' authority</u>, but rather <u>certain decisions</u> made pursuant to that authority. Defendants' actions, to the extent addressed and as complained of in the Complaint, were well within the scope of their authority as Commissioners of the DOC and they are thus immune from suit in this action.

Absolute immunity provides an immunity from suit, not just a defense to a claim. Cf. *Murray v. White*, 155 Vt. 621, 626–27 (1991) ("The desire in *Levinsky* to promote summary judgment resolution of qualified immunity claims is consistent with the perception that qualified immunity is indeed an immunity from the suit itself, not just a defense to ultimate liability."). Thus, as defendants Menard and Pallito, in his professional capacity, were acting within the scope of their employment as Commissioners of the DOC, they are entitled to absolute immunity from suit for all claims. All claims against defendant Menard, and against defendant Pallito in his professional capacity, are dismissed.

## B: Claims as to the Individual Defendants

Plaintiff's claims alleged under counts 1, 5, 7, and 8 state causes of action not barred by sovereign or official immunity against defendants Pallito, in his individual capacity, and Byrne, in his official and individual capacity. The Court addresses the motion to dismiss for failure to state a claim as to these counts against these defendants.

### 1: Count 1 – Cruel and Unusual Punishment

Plaintiff claims that "Defendants pursued and/or acquiesced to policies and practices…, and engaged in the acts as described…, which resulted in a violation of Plaintiff's rights under Chapter I, Article 18 and Chapter II, § 39 of the Vermont Constitution to be free from the infliction of cruel and unusual punishment." (Compl. ¶ 67). Specifically, Plaintiff claims that he "was viciously attacked and severely injured while incarcerated at the [LAC] as a result of the intentional and malicious acts and deliberate indifference…of Defendants." (*Id.* ¶ 68). Defendants note the scarce precedent interpreting these provisions of the Vermont Constitution, but argue nonetheless that Article 18 is not self-executing, and that Plaintiff fails to allege facts necessary to state a claim under § 39, assuming its protections are coextensive with the Eighth Amendment of the Federal Constitution.

The first issue to be resolved is whether these sections of the Vermont Constitution are self-executing such that they support a private right of action against the State or its agents without implementing legislation. "In determining whether a constitutional provision is self-executing, most jurisdictions have measured their constitutions against the standard adopted by the United States Supreme Court in *Davis v. Burke*:

> 'A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, ...

and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law....'

... In short, if complete in itself, it executes itself." *Shields*, 163 Vt. at 223–24.

> Determining whether a provision supplies a sufficient rule entails application of certain relevant criteria, no one of which is dispositive. First, a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection. Ordinarily a self-executing provision does not contain a directive to the legislature for further action. The legislative history may be particularly informative as to the provision's intended operation. Finally, a decision for or against self-execution must harmonize with the scheme of rights established in the constitution as a whole.

*Id.* at 224 (internal citations omitted).

The first factor requires an analysis of the relevant sections of the Vermont Constitution. Article 18, entitled "Regard to fundamental principles and virtues necessary to preserve liberty" states as follows:

> That frequent recurrence to fundamental principles, and a firm adherence to justice, moderation, temperance, industry, and frugality, are absolutely necessary to preserve the blessings of liberty, and keep government free; the people ought, therefore to pay particular attention to these points, in the choice of officers and representatives, and have a right, in a legal way, to exact a due and constant regard to them, from their legislators and magistrates, in making and executing such laws as are necessary for the good government of the State.

Vt. Const. Ch. I, Art. 18. Chapter II, Section 39, entitled "Forms of prosecutions and indictments; fines" states as follows:

> All prosecutions shall commence, *By the authority of the State of Vermont*. All Indictments shall conclude with these words, *against the peace and dignity of the State*. And all fines shall be proportioned to the offences.

Vt. Const. Ch. II, § 39. The Vermont Supreme Court has held that Article 18 and § 39 are the equivalent of the Eighth Amendment in other circumstances. See *State v. Venman*, 151 Vt. 561, 572 (1989) (considering § 39 and the Eighth Amendment and finding that "[f]or purposes of the issues before the Court in this case, we find no relevant difference between the state and federal constitutional standards."); *State v. Burlington Drug Co.*, 84 Vt. 243, 249–50 (1911) (discussing the interpretation of the language now found in § 39 concerning "fines" and whether it applies to all punishments or fines only, and holding that even if this language does not encompass all punishments, "our Bill of Rights is not behind any in its assertion of the fundamental principles of free government, and the prohibition of excessive fines and cruel and unusual punishments is, in effect, found in article 18 of the Bill of Rights."). However, it has also held that these rights

are not found in our constitution, but in the common law. See *State v. O'Brien*, 106 Vt. 97, 107–08 (1934) (discussing a defendant's argument that a punishment ordered by a Vermont court constituted an "excessive fine or a cruel and unusual punishment, within the prohibition of the Eighth Amendment to the Federal Constitution" and stating "[o]ur state Constitution contains no similar prohibition. But the principle is one of common law," ultimately concluding it is a part of Vermont state law).

Considering the first factor in light of this discrepancy in the Vermont Supreme Court's precedent, Article 18 appears to state only general principles, which argues against its being interpreted as self-executing. Section 39, on the other hand, appears to state more than mere general principles, and sets forth a specific right in that "all fines shall be proportioned to the offences." However, given the Court's interpretation of these provisions in *Burlington Drug Company*, it would appear that the two provisions must be read together to prohibit all cruel and unusual punishments. 84 Vt. at 250. Thus, to the extent that Section 39 sets forth a specific right, that right is fully fleshed out by its being read in concert with Article 18, and together they set forth a specific prohibition against cruel and unusual punishments of all kinds, which constitutes one of the "fundamental principles of free government." *Id.* The first factor argues in favor of these provisions being read as self-executing.

Neither provision contains a directive that the state legislature act to implement the right, which argues in favor of the provisions as being self-executing. As to the third factor, "no record exists of any discussion or debate over the adoption of the Vermont Constitution," thus there exists no legislative history to guide the Court's decision. *Shields*, 163 Vt. at 225. Finally, as to the fourth factor, the Vermont Supreme Court has already acknowledged the existence of this right within "the scheme of rights established in the constitution as a whole." *Id.* at 224; see *Venman*, 151 Vt. at 572; *Burlington Drug Co.*, 84 Vt. at 249–50. A decision that the provision is self-executing is in harmony with the existing scheme of rights. Thus the Court finds that Article 18 and Section 39, read together to prohibit the imposition of cruel and unusual punishments, are self-executing.

The Court's finding that these provisions are self-executing and support an action against the State and its agents is only the first hurdle over which the Plaintiff must pass to survive a motion to dismiss for failure to state a claim. The Court must also find that "monetary damages are the proper remedy for a violation." *Shields*, 163 Vt. at 227–28. The Vermont Supreme Court has stated, however, that it will only "imply a monetary damages remedy to enforce constitutional rights where the Legislature has fashioned no other adequate remedial scheme. Where the Legislature has provided a remedy, although it may not be as effective for the plaintiff as money damages, [the Court] will ordinarily defer to the statutory remedy and refuse to supplement it." *Sheilds*, 163 Vt. at 234–35. "Determining whether a constitutional tort merits monetary relief, therefore, necessarily compels a careful inquiry into the precise nature of the injury alleged and the adequacy of existing remedies to redress it." *In re Town Highway No. 20*, 2012 VT 17, ¶ 36, 191 Vt. 231.

The injury alleged by Plaintiff is that the State Defendants, with full knowledge of the existing risks and dangers to Vermont inmates posed by the LAC due to its lax policies and inadequate staff, nonetheless contracted with the CCA to send Vermont inmates to the LAC. The State Defendants are alleged to have disregarded the safety and welfare of Vermont inmates, including Plaintiff, in favor of recouping the financial benefits presented by cheaper out-of-state prisons.

The State Defendants do not point to any existing remedies to address this injury, though they do suggest that remedies exist under federal law. (State Defs.' Mot. at 16). However, as Plaintiff points out,

> While certain wrongs may find redress under federal law, we recognize the inherent and independent value in the rights and protections enshrined in our own constitution.… Thus, the rights enumerated within our Constitution provide no less authority in supporting a cause of action than the rights set out in our statutes or in this Court's precedent, presuming those constitutional rights are found to be self-executing.

*In re Town Highway No. 20*, 2012 VT 17, ¶¶ 27–28, 191 Vt. 231. Moreover, it is not clear what remedy would be available to Plaintiff under federal law as his claims concern the State's actions in sending him to the LAC. See *De La Rosa v. State*, 662 N.Y.S.2d 921, 924 (Ct. Cl. 1997) (stating that "the existing Federal money damage claim recognized" in *Estelle v. Gamble,* 429 U.S. 97 (1976), "where the United States Supreme Court held that a deliberately indifferent failure by state prison officials to provide adequate medical care to an inmate constituted cruel and unusual punishment under the Eighth Amendment giving rise to a civil rights cause of action under 42 U.S.C. § 1983," "and its progeny fails to reach State action, where the majority of potential violations are likely to occur, because the State is not subject to suit pursuant to 42 U.S.C. 1983.").

In *Shields*, the Court found that the alleged constitutional tort (for damage recovery following State closure of plaintiff's day care facility) did not merit monetary relief. An extensive administrative process was available to plaintiff, provided by various statutes enacted by the Legislature, and that "allowing monetary damages in cases like this would threaten to eviscerate the administrative scheme the Legislature has adopted." 163 Vt. at 237. This situation is distinguishable from the one at bar. There exist certain internal procedures by which a prisoner may register a grievance with DOC. See *Gilbeau v. Dep't of Corr. & Centurion Med. Servs.*, No. 2016-236, 2016 WL 7353065, at *2 (Vt. Dec. 1, 2016) (unpublished mem.) ("the Legislature has directed the commissioner of DOC to 'establish procedures to review the grievances of inmates.' 28 V.S.A. § 854. DOC has implemented an offender grievance system that includes procedures for filing informal, emergency, and formal grievances, with administrative appeals to corrections executives and ultimately the commissioner."). However, this remedy does not appear to have been provided by the Legislature to address specifically the kind of injury alleged by Plaintiff. Certainly an inmate facing alleged increased future physical harm perils at LAC could not successfully seek a personal re-transfer to Vermont, nor

cancelation of the LAC state contract, through the limited DOC grievance procedures. Nor do the DOC grievance procedures appear to offer an effective remedy for Mr. Godin's claim of cruel and unusual punishment. For example, injunctive relief will not help Plaintiff, as he is no longer incarcerated at the LAC. Plaintiff has already allegedly suffered physical, emotional and financial harm from his alleged state constitutional deprivation. See *In re Town Highway No. 20*, 2012 VT 17, ¶ 47.

Further, other courts have recognized the existence of a private cause of action against state officials in their individual capacity for violations of provisions guaranteeing the right to be free from cruel and unusual punishment. The U.S. Supreme Court has recognized that damages are the appropriate remedy for a violation of the Eighth Amendment and upheld a constitutional tort suit against the individual federal agents who violated the persons' rights. See *Carlson v. Green*, 446 U.S. 14, 19–23 (1980). New York state courts have found that a damages remedy is appropriate for a violation of the right against cruel and unusual punishments under its constitution. See, e.g., *Boggs v. State*, 25 N.Y.S.3d 545, 550–53 (N.Y. Ct. Cl. 2015) ("Inasmuch as case law supports the view that the State Constitution's prohibition against cruel and inhuman punishment (article 1, § 5), like the Eighth Amendment of the Federal Constitution, may form the basis for a constitutional tort cause of action, defendant's contrary contention is rejected.").

California courts rejected inferring a private right of action under its constitution. *Giraldo v. California Dep't of Corr. & Rehab.*, 85 Cal. Rptr. 3d 371, 388–91 (Cal. Ct. App. 2008) ("[W]e conclude there is no basis to recognize a claim for damages under article I, section 17 of the California Constitution."). In *Giraldo*, however, the court found compelling the fact that there existed parallel federal remedies as a factor disfavoring finding a private right of action. *Id.* at 390. Given that the Vermont Supreme Court has not found the existence of a parallel federal remedy persuasive in foreclosing the existence of a remedy under the state constitution, see *In re Town Highway No. 20*, 2012 VT 17, ¶¶ 27–28, California's reasoning is not as persuasive as that of the New York courts.

As a result of the above, the Court will allow Plaintiff to pursue his claim for an implied monetary damages remedy for a violation of the right against cruel and unusual punishments under the Vermont Constitution, as interpreted by the Supreme Court, as existing in Article 18 and § 39. The Court comes to this conclusion particularly in light of the extremely early state of this case, where the State Defendants have not even answered the Complaint, and the novel nature of Plaintiff's claim in Count 1. As the Vermont Supreme Court has admonished,

> A motion to dismiss for failure to state a claim is not favored and rarely granted. Moreover, courts should be especially reluctant to dismiss on the basis of pleadings when the asserted theory of liability is novel or extreme. The legal theory of a case should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations.

*Ass'n of Haystack Prop. Owners, Inc. v. Sprague*, 145 Vt. 443, 446–47 (1985) (internal citations omitted).

There remains the issue of whether Plaintiff has stated a viable claim under this nascent theory of liability. The Court has equated the protections provided by the Vermont Constitution concerning cruel and unusual punishments as being coextensive with those afforded by the Eighth Amendment, see *Venman*, 151 Vt. at 572, and thus this Court looks to precedent interpreting violations of the Eighth Amendment to determine whether Plaintiff has sufficiently alleged a violation of his rights.

To establish a claim under the Eighth Amendment for cruel and unusual punishment stemming from a prison official's violation of his or her duty "to protect prisoners from violence at the hands of other prisoners" or otherwise "take reasonable measures to guarantee the safety of inmates," a plaintiff must plead two elements:

> First, the deprivation alleged must be, objectively, "sufficiently serious"; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

> The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety.

*Farmer v. Brennan*, 511 U.S. 825, 832–33, 834 (1994) (internal citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Here, Plaintiff alleges conditions which may be viewed as posing a substantial risk of serious harm. He claims that the LAC is understaffed, and that inmates receive inadequate supervision. (Compl. ¶¶ 12–17). He claims that the LAC's staffing issues are compounded by lax policies concerning inmates' possession of razor blades and other contraband. (*Id.* ¶¶ 20–28). Additionally, he claims that multiple assaults on prisoners, as well as a "major riot," occurred at the LAC, all during periods when DOC contracted to send prisoners there, including two other incidents in the months before his attack, one of which involved an assault with a razor-blade shank. (*Id.* ¶¶ 31–37).

Plaintiff also alleges sufficient facts which may support a claim of deliberate indifference to inmate health or safety. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."

*Farmer*, 511 U.S. at 842.[9]  As to defendant Byrne, Plaintiff alleges that he testified as to his knowledge that prisoners at the LAC received less supervision than inmates in Vermont prisons, and that there are fewer staff at the facility.  (Compl. ¶¶ 13, 15).  Plaintiff also alleges that testimony was given in the Vermont Legislature in March of 2013 concerning the unsafe conditions at the LAC.  (*Id.* ¶ 35).  Connecting these two pieces of information, Plaintiff alleges that defendants Pallito and Byrne "clearly knew that the [LAC] was woefully understaffed and significantly more dangerous than Vermont prisons." (*Id.* ¶ 39).  Despite knowledge of this danger, defendants Pallito and Byrne "continued to renew the DOC contracts with CCA, and continued to send Vermont prisoners to the [LAC]." (*Id.* ¶ 40).  Consequently, Plaintiff was sent to the LAC, was injured by another inmate wielding a razorblade in a location with no prison personnel overseeing the inmates, and was then given inadequate medical treatment, resulting in exactly the kind of injuries these known dangers would cause.  (*Id.* ¶ 63).

"The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health,' and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843 (internal citation omitted).  Plaintiff has sufficiently pled facts in the Complaint to survive a motion to dismiss on the pleadings as to Count 1 alleging cruel and unusual punishment.

2:  Count 5 – Intentional Infliction of Emotional Distress

Plaintiff claims in Count 5 that the State Defendants' conduct "was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decent and tolerable conduct in a civilized community, and should be regarded as atrocious and utterly intolerable by failing to ensure that CCA provided sufficient guards to protect the inmates at the [LAC] for the primary purpose of saving money with the knowledge that the failure to provide adequate staffing placed the inmates at greater harm, and by allowing the CCA to give razor blades to inmates at the [LAC] contrary to DOC's policy for inmates incarcerated in Vermont, which as a result, lead to Plaintiff being viciously attacked and severely injured by a razor-blade shank while under the care of Defendants." (Compl. ¶ 84).  "As a direct and foreseeable result, Plaintiff has suffered severe and permanent emotional distress." (*Id.* ¶ 86).  The State

---

[9] In the Second Circuit, "[i]t is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Further, to state a claim under § 1983 "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply." *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).  The State Defendants included in their brief a long string cite of cases applying this standard in similar, but ultimately distinguishable circumstances, and give no argument as to how these factors apply to the facts in the case at bar.  (State Defs.' Mot. at 18–19).  Given the novelty of Plaintiff's cause of action, the fact that the State Defendants did not argue for the application of this standard to Plaintiff's claim nor address how Plaintiff's allegations failed to meet the standards articulated under this precedent, and the extremely early stage of this case, the Court declines to dismiss Plaintiff's claim on the basis that it was not sufficiently pled to these standards.

Defendants argue that Plaintiff has failed to state a claim for Intentional Infliction of Emotional Distress ("IIED").

"Plaintiff's burden on this claim is a 'heavy one.'" *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395. "The court makes the initial determination of whether a jury could reasonably find that the alleged conduct satisfies all the elements of an IIED claim." *Id.* "The elements of an IIED claim are: '(1) conduct that is extreme and outrageous, (2) conduct that is intentional or reckless, and (3) conduct that causes severe emotional distress.'" *Baptie v. Bruno*, 2013 VT 117, ¶ 24, 195 Vt. 308. "An IIED claim can be sustained only where the plaintiff demonstrates 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Colby*, 2008 VT 20, ¶ 10. "Established law…posits an objective test for outrageousness: a plaintiff must demonstrate legal harm resulting from inflicted distress so severe that no reasonable person could be expected to endure it." *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 57 (1994).

The conduct alleged to have caused Plaintiff's emotional distress is the decision of the State Defendants to contract with CCA to house Vermont inmates out of state, including at the LAC, without ensuring that the facility would provide adequate levels of staffing, all the while knowing that the LAC was understaffed, and further, allowing the CCA to maintain lax rules about the possession of razor blades, contrary to DOC's policies concerning Vermont prisons. This does not amount to the kind of "outrageous conduct" intended to form the basis of an action for IIED. See Restatement (Second) of Torts § 46 cmt. d (1965) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"). Additionally, Plaintiff's allegations do not reflect any intent on the part of the State Defendants having to do with intentionally or even recklessly causing emotional distress by conduct that was specifically directed at Plaintiff or any other specific Vermont inmate housed at LAC.

Plaintiff has failed to state a claim for intentional infliction of emotional distress against the State Defendants. This claim is therefore dismissed as to defendant Pallito in his individual capacity, and defendant Byrne in his official and individual capacity. V.R.C.P. 12(b)(6).

### 3: Count 7 – Assault

Plaintiff alleges a cause of action for assault against the State Defendants in that they "pursued and/or acquiesced to policies and practices as set forth above, and engaged in the acts as described above, which are expected to result in inmates placing other inmates at the [LAC] in imminent apprehension of unwanted harmful and offensive contact." (Compl. ¶ 91). As a result of "the intentional acts and deliberate indifference" of the State Defendants, "Plaintiff was placed in imminent apprehension of being viciously attacked and severely injured while incarcerated at the [LAC]," resulting in harm. (*Id.* ¶¶ 92–93). The State Defendants argue Plaintiff has failed to state a claim in that he has not alleged intent to cause harmful and offensive contact.

In their 3/21/17 reply brief the State Defendants assert (Page 14) the VTCA waiver for claims "arising out of alleged assault, battery" found in 12 V.S.A. § 5601(e)(6). This would bar Count 7. See *LaShay v. Dept. of Social & Rehab. Serv*., 160 Vt. 60, 69 (1993).

The assault and battery VTCA waiver in effect re-asserts sovereign immunity for the State for battery claims. This exception, unlike 12 V.S.A. §5601(e)(1) is not premised upon longstanding policy determinations that afford the State and its actors a sphere of discretionary decision-making integral to their performance of their duties. Plaintiff might argue that the assault and battery waiver should be overridden by his Article 4 arguments analyzed, *infra*.

Even if the court concluded that that Article 4 might otherwise allow a suit for assault to go forward against the State, for an assault committed by one of its employees in the scope of their employment, Count 7 would still be subject to dismissal. According to the Restatement, "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). "An act is done with the intention of putting the other in apprehension of an immediate harmful or offensive contact if it is done for the purpose of causing such an apprehension or with knowledge that, to a substantial certainty, such apprehension will result." *Id.* § 21 cmt. d. "[I]ntent is an essential element of assault and battery." *Wilson v. Smith*, 144 Vt. 358, 361 (1984). "[I]f the party threatening the assault has the ability, means, and apparent intention, to carry his threat into execution, it may in law constitute an assault." *Kent v. Katz*, 146 F. Supp. 2d 450, 463 (D. Vt. 2001), *aff'd in part,* 312 F.3d 568 (2d Cir. 2002) (internal quotation marks omitted).

Plaintiff's allegations fail to establish the requisite intent on the part of the State Defendants to plead a cause of action in assault. There is no allegation, nor can a reasonable allegation be made on the facts as stated in the Complaint, that the State Defendants put Plaintiff "in apprehension of an *immediate* harmful or offensive contact" by either contracting with CCA, or by failing to force CCA to impose stricter rules on razor blade retention by inmates and increase staffing levels. See Restatement (Second) of Torts § 21 cmt. d (emphasis added). Plaintiff argues in his Opposition that the State Defendants "were a direct participant in the assault…through their intentional action of arming the inmate who attacked Plaintiff with razor blades." (Pl.'s Opp'n at 40). There is no allegation of such arming in the Complaint, and no reasonable inferences can be drawn from the allegations in the Complaint to support such a claim.

Plaintiff has failed to state a claim sounding in assault against the State Defendants, and Count 7 is thus dismissed as to defendant Pallito in his individual capacity, and defendant Byrne in his official and individual capacity. V.R.C.P. 12(b)(6).

## 4: Count 8 – Battery

The State Defendants have also raised the VTCA waiver for claims "arising out of alleged assault, battery" found in 12 V.S.A. § 5601(e)(6) on these claims. This would bar Count 8. *LaShay v. Dept. of Social & Rehab. Serv.*, 160 Vt. 60, 69 (1993).

Similar to the Count 7 assault claim, if the court assumed that Plaintiff's Article 4 claims overrode this VTCA provision the court finds Count 8 battery claim fails at the pleading stage as to the State Defendants,

Plaintiff alleges a cause of action for battery against the State Defendants in that they "pursued and/or acquiesced to policies and practices as set forth above, and engaged in the acts as described above, which are expected to result in inmates intentionally attacking and severely injuring other inmates at the [LAC]." (Compl. ¶ 95). As a result of "the intentional acts and deliberate indifference" of the State Defendants, "Plaintiff was viciously attacked and severely injured while incarcerated at the [LAC]," resulting in harm. (*Id.* ¶¶ 96–97). The State Defendants argue Plaintiff has failed to state a claim in that he has not alleged intent to cause harmful and offensive contact.

As stated in the Restatement, "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Restatement (Second) of Torts § 13. More simply, a battery "is an intentional act that results in harmful contact with another." *Christman v. Davis*, 2005 VT 119, ¶ 6, 179 Vt. 99. "To make the actor liable for a battery, the harmful bodily contact must be caused by an act done by the person whose liability is in question." Restatement (Second) of Torts § 14. "An external manifestation of the will is necessary to constitute an act, and an act is necessary to make one liable under the rule stated in § 13." *Id.* § 14 cmt. b. For example, the Court of Appeals of Utah dismissed a cause of action against a bystander, J.S., who allegedly failed to intervene to stop a coworker, T.P. from assaulting plaintiff, noting that "this is a clear case of assault and battery inflicted by T.P.; he was the actor, not J.S." *D.D.Z. v. Molerway Freight Lines, Inc.*, 880 P.2d 1, 4 (Utah Ct. App. 1994).

Here, Plaintiff has alleged no act done by the State Defendants that directly or indirectly resulted in harmful contact with the Plaintiff. At most, Plaintiff has alleged that the State Defendants contracted with CCA, knowing it maintained unsafe facilities like the LAC, and failed to require CCA to remedy certain aspects of their facility management which resulted in a greater possibility that another inmate might be able to attack Plaintiff with a razor blade. As noted above, Plaintiff's assertion in his Opposition that the State Defendants somehow "armed" the inmate who attacked Plaintiff is not warranted based on the allegations in the Complaint.

Plaintiff has failed to state a claim sounding in battery against the State Defendants, and Count 8 is thus dismissed as to defendant Pallito in his individual capacity, and defendant Byrne in his official and individual capacity. V.R.C.P. 12(b)(6).

### III:  Order

The Motion of Defendants the Vermont Department of Corrections; Lisa Menard, in her official capacity; and Andrew Pallito, in his official capacity, to dismiss for lack of subject matter jurisdiction under V.R.C.P. 12(b)(1) is granted as to all Counts.

Counts 2, 3, 4, 6, 9, and 10, which all allege causes of action sounding in less than gross negligence or willful misconduct, are dismissed against defendants Pallito, in his individual capacity, and Richard Byrne, in his official and individual capacity, as being improperly pled against them.  12 V.S.A. § 5602(a).  The "exclusive right of action" as to these claims lies against the State, *id.*, which has not waived its sovereign immunity as to Plaintiff's cause of action.  See *id.* § 5601(e)(1).

The Motion of Defendants Pallito, in his individual capacity, and Byrne, in his official and individual capacity, to dismiss for failure to state a claim on which relief may be granted under Rule 12(b)(6) is granted in part, as to Counts 5, 7, and 8, and denied in part, as to Count 1.

SO ORDERED in St. Albans, Vermont on this ___ day of August, 2017.

 

_____
Hon. Michael Harris
Superior Court Judge